UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; ESURANCE INSURANCE COMPANY; and ESURANCE PROPERTY AND CASUALTY INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs, | |
| v. | **Demand for Jury Trial** |
| ISPINE, PLLC; SURGICAL CENTER OF SOUTHFIELD, LLC; NORTHWEST NEUROLOGY, P.C.; PERFORMANCE ORTHOPEDICS OF MICHIGAN PLLC; BRR MEDICAL SUPPLY, INC.; GULF COAST MEDICAL SERVICES, LLC; CCT MEDICAL SUPPLIES, INC; STEFAN PRIBIL, M.D.; WESLEY BLAKE BARBER; TESSY JENKINS, M.D.; and ROBERT SWIFT, D.O., | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance

Company, Allstate Property and Casualty Insurance Company, Esurance Insurance

Company, and Esurance Property and Casualty Insurance Company (hereinafter

1

collectively referred to as "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, hereby allege as follows.

## I.   <u>INTRODUCTION</u>

1.     This is a case about medical clinics, an ambulatory surgery center, an intraoperative neuromonitoring ("IONM") provider, durable medical equipment ("DME") suppliers, and the physicians, owners, managers, agents, and representatives of the same who engaged in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent records, bills, and invoices through interstate wires and the U.S. Mail seeking to collect payment from Allstate for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to Allstate policies and applicable statutes and regulations, including the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*.

2.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants pursuant to Allstate policies and applicable statutes and regulations.

3.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

4.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt

Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

5.     As a result of the defendants' fraudulent acts, Allstate has paid in excess of $730,805 to them related to the patients at issue in this Complaint

## II.   THE PARTIES

### A.   PLAINTIFFS

6.     Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

7.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company are companies duly organized and existing under the laws of the State of Wisconsin.

8.     Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company have their respective principal places of business in Northbrook, Illinois.

9.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company have their respective principal places of business in San Francisco, California.

10.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

**B.     DEFENDANTS**

**1.     ISpine, PLLC**

11.     ISpine, PLLC ("ISpine") is organized under the laws of the State of Florida.

12.     ISpine is owned by Stefan Pribil, M.D. ("Pribil"), who is a citizen of the State of Florida.

13.     At all relevant times, ISpine was operated and conducted by Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center ("Fountain View"), Northwest Neurology, P.C. ("Northwest Neurology"), BRR Medical Supply, Inc. ("BRR Medical"), Gulf Coast Medical Services, LLC ("Gulf Coast"), CCT Medical Supplies, Inc ("CCT Medical"), Pribil, Wesley Blake Barber ("Barber"), Tessy Jenkins, M.D. ("Jenkins"), and Robert Swift, D.O. ("Swift").

14.     ISpine's principal place of business is located in Southfield, Michigan.

15.     Since January 1, 2019, ISpine has billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 1.

4

**2.**   **Surgical Center of Southfield, LLC**

16.   Surgical Center of Southfield, LLC is organized under the laws of the State of Michigan.

17.   Surgical Center of Southfield, LLC also does business using the registered fictitious name Fountain View Surgery Center.

18.   Fountain View is owned by David Williams, Jeffrey Carroll, M.D., Mark Goldberger, M.D., and Swift, all of whom are citizens of the State of Michigan.

19.   At all relevant times, Fountain View was operated and conducted by ISpine, Performance Orthopedics of Michigan PLLC ("Performance Orthopedics"), Pribil, Barber, and Swift.

20.   Fountain View's principal place of business is located in Southfield, Michigan.

21.   Fountain View billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 2.

**3.**   **Northwest Neurology, P.C.**

22.   Northwest Neurology, P.C. is incorporated under the laws of the State of Michigan.

23.     At  all  relevant  times,  Northwest  Neurology  was  operated  and conducted by ISpine, Pribil, Barber, and Jenkins.

24.     Northwest  Neurology's  principal  place  of  business  is  located  in Southfield, Michigan.

25.     Since 2018, Northwest Neurology billed Allstate for services that were not  actually  rendered,  were  medically  unnecessary  (to  the  extent  services  were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 3.

### 4.     Performance Orthopedics of Michigan PLLC

26.     Performance  Orthopedics  of  Michigan  PLLC  is  organized  under  the laws of the State of Michigan.

27.     Performance  Orthopedics  is  owned  by  Swift,  who  is  a  citizen  of  the State of Michigan.

28.     At  all  relevant  times,  Performance  Orthopedics  was  operated  and conducted by Fountain View, BRR Medical, Gulf Coast, Barber, and Swift.

29.     Performance  Orthopedics's  principal  place  of  business  is  located  in Southfield, Michigan.

30.     Performance  Orthopedics  billed  Allstate  for  services  that  were  not actually rendered, were medically unnecessary (to the extent services were rendered

at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 4.

### 5.    BRR Medical Supply, Inc.

31.    BRR Medical Supply, Inc. is incorporated under the laws of the State of Michigan.

32.    At all relevant times, BRR Medical was operated and conducted by ISpine, Performance Orthopedics, Pribil, Barber, and Swift.

33.    BRR Medical's principal place of business is located in Rochester Hills, Michigan.

34.    BRR Medical billed Allstate for services and DME that were not actually provided, were medically unnecessary (to the extent services and DME were provided at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 5.

### 6.    Gulf Coast Medical Services, LLC

35.    Gulf Coast Medical Services, LLC is organized under the laws of the State of Delaware.

36.    Gulf Coast also does business using the registered fictitious name Gulf Coast Medical, LLC.

37.    Gulf Coast is owned by Scott Stratmann, D.C., who is a citizen of the State of Arizona.

38.     At all relevant times, Gulf Coast was operated and conducted by ISpine, Performance Orthopedics, Pribil, Barber, and Swift.

39.     Gulf Coast's principal place of business is located in Troy, Michigan.

40.     Gulf Coast billed Allstate for services and DME that were not actually provided, were medically unnecessary (to the extent services and DME were provided at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 6.

## 7.     CCT Medical Supplies, Inc

41.     CCT Medical Supplies, Inc is organized under the laws of the State of Michigan.

42.     At all relevant times, CCT Medical was operated and conducted by ISpine, Pribil, and Barber.

43.     CCT Medical's principal place of business is located in Waterford, Michigan.

44.     CCT Medical billed Allstate for services and DME that were not actually provided, were medically unnecessary (to the extent services and DME were provided at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 7.

## 8.     Stefan Pribil, M.D.

45.     Pribil is a resident and citizen of the State of Florida.

8

46.     At all relevant times, Pribil operated and conducted ISpine, Fountain View, Northwest Neurology, BRR Medical, Gulf Coast, and CCT Medical.

### 9.     **Wesley Blake Barber**

47.     Barber is a resident and citizen of the State of Michigan.

48.     At all relevant times, Barber operated and conducted ISpine, Fountain View, Northwest Neurology, Performance Orthopedics, BRR Medical, Gulf Coast, and CCT Medical.

### 10.     **Tessy Jenkins, M.D.**

49.     Jenkins is a resident and citizen of the State of Michigan.

50.     At all relevant times, Jenkins operated and conducted ISpine and Northwest Neurology.

### 11.     **Robert Swift, D.O.**

51.     Swift is a resident and citizen of the State of Michigan.

52.     At all relevant times, Swift operated and conducted Fountain View, Performance Orthopedics, BRR Medical, and Gulf Coast.

## III.     **JURISDICTION AND VENUE**

53.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

9

54.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

55.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

56.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.     BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

57.     The defendants used the RICO enterprise clinics discussed herein to submit exorbitant charges to Allstate for purported medical services, procedures, and equipment that were not actually provided, were unlawful, were not medically necessary, and were fraudulently billed.

58.     The purpose of the scheme was to generate the highest possible amount of charges both to seek recovery directly from Allstate and to sell the right to seek collection from Allstate to third parties, a business called "factoring" by its participants.

59.     The fraudulent scheme described herein was primarily driven by excessive and medically unnecessary procedures and services ordered, billed, and allegedly performed by ISpine.

10

60.    ISpine was formed in Florida by defendant Pribil, who was a neurosurgeon practicing in Florida until he was recruited to travel to Michigan to generate bills for submission pursuant to Michigan's No-Fault Act (which, unlike Florida, has unlimited medical benefits).

61.    Pribil was recruited to establish ISpine's operation in Michigan by defendant Barber, who is now ISpine's practice administrator, and the owner of an ambulatory surgery center in Michigan named Michael Angelo ("Angelo").

62.    Defendant Barber has a lengthy history in the medical factoring business, and is currently under indictment for his role in a scheme to recruit women to fly to different states for medically unnecessary surgeries involving removal of transvaginal mesh.  *See* United States of America v. Wesley Blake Barber, *et al.*, No. 1:19-cr-00239 (E.D.N.Y.).

63.    Among the allegations in the indictment against Barber are that he facilitated travel by women to physicians with whom Barber worked to have unnecessary surgery and Barber then "purchased and resold medical debts for profit." Id.

64.    The scheme described herein is remarkably similar to that for which Barber was indicted, as the defendants recruited patients who claimed to be involved in motor vehicle accidents to undergo unnecessary procedures, which were almost

always invasive surgeries, and then sold the right to collect on the medical bills to third parties.

65.     ISpine has admitted in sworn discovery responses that Barber is the "sole practice administrator" of ISpine and that he works 40-80 hours per week operating the clinic.

66.     Barber, who is a layperson, regularly directs patient treatment at ISpine to ensure that patients are coerced to undergo expensive surgical procedures as quickly as possible.

67.     A former ISpine nurse named Kim Lilly-Bernau, N.P. ("Lilly-Bernau") testified about the extent of Barber's control over the clinic:

> Q.  And this was Blake?
>
> A.  Yes.
>
> Q.  Who's not a doctor?
>
> A.  Who's not a doctor but he owned the business. This was - - iSpine is really his business…
>
> Q.  So Blake, Blake was the owner of iSpine and he was doing the billing?
>
> A.  Everyone said, everyone said that Dr. Pribil, that we all worked for Blake, that we're not really working for Dr. Pribil, yes.
>
> Q.  And Blake was the owner?
>
> A.  It was really Blake, but iSpine was Blake's baby, yes.

68.     Lilly-Bernau further testified that when she made a medical decision that diverted patients from ISpine, Blake threatened to fire her:

> A. Oh sometimes - - so if I didn't try to fill up the schedule, I would get screamed at, so I did my best to screen the patients.  If I felt like they needed shoulder surgery and neck surgery and I thought their shoulder was worse and I sent them away to an ortho specialist because I thought that was worse, I'd be in really big trouble with [Blake].  He's like, "if you know there's a neck problem, why are you making them leave? And I would say "Because their shoulder is worse." And I almost got fired over that a couple of times…
>
> Q. As a medical professional?...he would overrule you?
>
> A. I, I would be threatened dismissal if that ever happened again.

69.     Barber's control over ISpine was so thorough that he overrode Pribil and ISpine's biller when concerns were raised about whether ISpine could properly bill insurers for services provided by assistants, as depicted by the email exchange below:

**billing**
5 messages

Becky Arceneaux <becky.ispine@gmail.com>                                    Tue, Feb 5, 2019 at 11:46 AM
To: Wesley Barber <blake.ispine@gmail.com>

Blake,

Please review this info regarding billing for certified surgical tech and
advise if you still want me to bill the tech.

Thank you,
Becky Arceneaux, CMA
Stefan G Pribil,M.D.,FAANS
Diplomate American Board of Neurological Surgeons
ISpine,PLLC
Phone : 407-357-0635 or 985-209-8628
Fax 407-483-4883

> 🗎 **Billing guidelines for billing asst in surgery.pdf**
> 610K

---

Wesley Barber <blake.ispine@gmail.com>                                     Tue, Feb 5, 2019 at 11:56 AM
To: Becky Arceneaux <becky.ispine@gmail.com>

Who is Moda Health?
[Quoted text hidden]

---

Becky Arceneaux <becky.ispine@gmail.com>                                    Tue, Feb 5, 2019 at 12:11 PM
To: Wesley Barber <blake.ispine@gmail.com>

It was a sight on line for modifiers and who is billable. Also the cpt book on modifiers does not give a modifier for the CST.
Please talk to Dr. Pribil as he has ask that I not bill it as of today.
He is on his way to the airport now.

Thank you,
Becky Arceneaux, CMA
Stefan G Pribil,M.D.,FAANS
Diplomate American Board of Neurological Surgeons
ISpine,PLLC
Phone : 407-357-0635 or 985-209-8628
Fax 407-483-4883

[Quoted text hidden]

---

Wesley Barber <blake.ispine@gmail.com>                                     Tue, Feb 5, 2019 at 12:45 PM
To: Becky Arceneaux <becky.ispine@gmail.com>

I would say bill him, but at like 10 to 12 percent of our bill

On Tue, Feb 5, 2019 at 11:46 AM Becky Arceneaux <becky.ispine@gmail.com> wrote:
[Quoted text hidden]

---

70.    Layperson Barber also created medical records and bills that were sent

to insurers, including making amendments to operative reports after they were

prepared by the physician.  For example:

Wesley Barber <blake.ispine@gmail.com>                          Wed, May 15, 2019 at 12:01 PM
To: Becky Arceneaux <becky.ispine@gmail.com>, admin@clinicofcolumbia.com

Please send to carrier. I amended the report to ███████████

Thanks,

Blake

▨ ████████  Op Report Amended.pdf
   416K

71.     Pribil has testified that Barber was paid a percentage of the amount received by ISpine from insurers, which created a financial motivation for Barber to cause ISpine to bill for as many surgeries as possible.

72.     Barber, along with business partners named Ihan Rodriguez and Salah Jahad, also entered into contracts with the third parties who purchased the defendants' bills whereby they were paid "commissions" (i.e., kickbacks) that were based on the amount of the bills purchased.

73.     For example, Barber had a separate contract whereby he was personally paid up to five percent (5%) of the amount of the ISpine accounts receivables sold, including for several of the patients at issue herein.

74.     Barber and Ihan Rodriguez formed a separate entity called AR Claims, LLC to receive these "commission" payments, which could reach tens of thousands of dollars due to the extensive bills and outrageous amounts charged by the participants in the scheme described herein.

75.     The defendants sold their accounts receivable to several different third parties, including Velocity MRS – Fund IV, LLC, Velocity MRS – Fund V, LLC,

Velocity MRS – Fund VI, LLC (collectively, "Velocity"), HMRF-Fund III, LLC, Funding4Doctors LLC ("Funding4Doctors"), and National Health Finance DM, LLC.

76.    The contracts between the defendants and the third parties who purchased their bills provided that the third parties would pay a predetermined percentage that was a fraction of the amount billed by the defendants to auto insurers.

77.    For example, the contracts between ISpine and Velocity provided for Velocity to pay ISpine just twenty-one percent (21%) of the amount billed to Allstate. *See* Exhibits 8 and 9.

78.    Thus, the defendants, and particularly Barber, had a significant financial motivation to bill Allstate for as many procedures, ancillary services, and DME as possible, at unconscionable rates and regardless of medical need and applicable standards of care, to maximize the amount they would receive pursuant to the contracts with their factoring partners.

79.    The defendants made decisions about patient treatment based on how or if they would be able to bill for it, as exemplified by the email below from defendant Pribil stating the reason that he wants an assistant for only some of the surgeries he allegedly performed:

Stefan Pribil <sgpribil@hotmail.com>
To: ISpine Main <office.ispine@gmail.com>

Fri, Aug 16, 2019 at 3:10 PM

Non Gaber patients i want joy to be assisting so we can bill.

Stefan Pribil MD

Diplomat American Association of Neurological Surgeons.
Fellow American Association of Neurological Surgeons.

80.     ISpine's former nurse also testified that the charges submitted by ISpine were not in line with what would have been submitted to other payors and that Barber drove the charges:

> Q. Are you saying that it appeared the charges were high with these auto insurance only companies?
>
> A. Yes.  It was like 5 to 10 times what a hospital would charge, you know, for a procedure, what I feel like reimbursement would be with normal insurance, and I just, and then I noticed it was a lot of nonmedical people who owned these businesses…
>
> Q. So what's the bill you saw?
>
> A. I think it was like a 100 or $120,000 for like a very simple Dr. Pribil case.  So this is what Blake does…Blake is a factoring agent.

81.     Barber met Angelo, who was integral to recruiting Pribil and ISpine to Michigan, through his factoring business.

82.     Angelo is currently named as a defendant in numerous lawsuits alleging that he defrauded automobile insurers in Michigan and business associates.

83.     When Barber advised Angelo that he was associated with a neurosurgeon in Florida (i.e., defendant Pribil) who may be able to generate bills at Angelo's ambulatory surgical center, Angelo dispatched a 26-year old layperson named Jordan Marsh ("Marsh") to Florida to observe Pribil.

84.     Based upon Marsh's observation, Angelo made Pribil the medical director of his ambulatory surgery center in Michigan and Pribil began flying to Michigan to bill for medically unnecessary surgical procedures.

85.     Pribil later testified that while serving as medical director he observed improper conduct at Angelo's surgery center and related clinics, including patients who were subjected to treatment he described as "criminal."

86.     Despite Pribil's admission of misconduct and improper treatment at Angelo's surgery center, he has continued to refer patients for medically unnecessary services billed by entities owned by Angelo.

87.     Angelo, Barber, and Marsh, along with an associate named Hassan Fayad, solicited patients and controlled their treatment to maximize the bills submitted by entities owned and controlled by each of these individuals, as exemplified by the email below:

| | |
|---|---|
| **From**: | USL Intake [uslintake@gmail.com] |
| on behalf of | USL Intake <uslintake@gmail.com> [uslintake@gmail.com] |
| **Sent**: | 5/30/2018 9:36:11 AM |
| **To**: | Wesley Barber [blake.ispine@gmail.com]; jordan.ispine@gmail.com |
| **CC**: | Michael Angelo [mamarketing@yahoo.com] |
| **Subject**: | Fwd: 1-800-US-LAWYER Deangelo Early |

PER MICHAEL:

WAITING ON CONFIRMATION FROM HASSAN WHEN THE PATIENT IS COMING IN. PLEASE DO NOT CALL UNTIL IT HAS BEEN ARRANGED BY HASSAN. ALL PROCEDURES, IF NECESSARY, WILL BE DONE AT MASRI.

88.     Barber and his associates referred to this arrangement of soliciting patients and divvying them up amongst themselves as a "cooperative":

18

From:           Marketing Wiz [marketingwiz33@gmail.com]
on behalf of    Marketing Wiz <marketingwiz33@gmail.com> [marketingwiz33@gmail.com]
Sent:           5/15/2018 5:25:40 PM
To:             Wesley Barber [blake.ispine@gmail.com]
CC:             Pacific Marketing and Advertising [pacificmarketingandadvertising@yahoo.com]; Hassan Fayad
                [transport4inc@yahoo.com]; Wesley Barber [blakeispine@gmail.com]
Subject:        Re: USL Advertising

Yes but you don't need the lawyer in the commercial

Sent from my iPhone

On May 15, 2018, at 4:20 PM, Wesley Barber <blake.ispine@gmail.com> wrote:

> Hi guys,
>
> If I am not mistaken you still need a law firm in order tone able to run the ad legally in Michigan
> otherwise you run the risk of running into a unauthorized practice of law issue. None of us need
> anything to do with the Michigan Bar chasing us down.
>
> On Tue, May 15, 2018 at 9:03 AM, Pacific Marketing and Advertising
> <pacificmarketingandadvertising@yahoo.com> wrote:
> Good News,
>
> Per Michael,
>
> Michael Morse is dropping out of key sponsorships and advertising. We are looking to
> pick them up beginning in June.
>
> Michael will be meeting with Masri next Thursday to discuss him contributing to the
> cooperative. Michael will be taking Thomas Quartz with him to the meeting with Masri;
> hopefully, this will make Masri feel more at easy with joining the cooperative. right now
> there is $80K per month for advertising.
>
> As you are aware, Luke's commercial has been pulled. We will air Jerry springer and
> the generic USL commercials from now on.
>
> Thank you,
>
> Ybana

89.    Patients solicited by the "cooperative" were frequently referred by its layperson members directly for treatments and testing, such as MRIs and neurosurgical consultations with defendant Pribil.

90.    Marsh is now engaged by ISpine to recruit and solicit patients through an entity called Focused Vision Marketing,

91.    Between February 2018 and May 2019, ISpine paid layperson Marsh/Focused Vision Marketing more than $115,000 for soliciting patients to undergo procedures.

92.     After it began billing insurers in Michigan, ISpine was also recruited by a former owner of defendant Fountain View named Mohammad Jaura ("Jaura") to perform the same types of procedures at his facility.

93.     Barber arranged for Fountain View to sell its accounts receivable to Velocity and received a commission for both the unreasonable bills submitted by ISpine and the unreasonable facility fees submitted by Fountain View to Allstate.

94.     Barber was also involved with the sale of accounts receivable by Performance Orthopedics to Funding4Doctors and, upon information and belief, received a personal financial gain from insurance claims submitted by defendant Performance Orthopedics.

95.     Jaura also introduced Pribil, Barber, and ISpine to an associate of his named Anwar Malik ("Malik"), who is a technician who bills for intraoperative neuromonitoring ("IONM").

96.     Pribil and ISpine previously performed surgeries without the use of IONM, but after they were introduced to Malik, the same surgeries always included tens of thousands of dollars in additional charges for IONM.

97.     Barber attempted to facilitate the factoring of bills generated by the IONM through Velocity to further increase his own personal profit from these unnecessary surgeries.

98.     When Velocity declined to purchase Malik's accounts receivable (meaning Barber did not get his kickback), ISpine, Pribil, and Barber stopped using Malik to perform IONM and engaged defendants Northwest Neurology and Jenkins to bill for such purported IONM testing.

99.     In October 2019, Barber arranged for Funding4Doctors to purchase the accounts receivable generated by the fraudulent bills submitted by Northwest Neurology and Jenkins.

100.    Northwest Neurology and Jenkins have a lengthy history of submitting claims to Allstate for esoteric neurologic testing that is not indicated for patients who claim to have been involved in minor motor vehicle accidents.

101.    In addition to the unnecessary IONM billed by Northwest Neurology and Jenkins, ISpine added predetermined prescriptions for DME to its protocol to maximize profit, which were billed by defendants BRR Medical, Gulf Coast, and CCT Medical, frequently for the same items of DME allegedly issued to the same patients.

102.    Defendant Performance Orthopedics used nearly identical predetermined prescriptions for DME for its medically unnecessary procedures, which were billed by defendants BRR Medical and Gulf Coast.

103.    Defendant Swift is a part owner of Fountain View and the owner of Performance Orthopedics.

104.   Swift also previously worked with Pribil at a clinic that operated in Angelo's surgery center.

105.   Swift and Performance Orthopedics engaged in the same practice as ISpine of billing for treatment that was not performed, was unlawful, and was medically unnecessary, and then factored the bills for profit.

106.   The defendants' scheme involving each of these entities, which is detailed below, resulted in millions of dollars in charges for unlawful, improper, excessive, redundant, and medically unnecessary medical services, if such services were provided at all, submitted to Allstate.

107.   The defendants' bills and associated records were sent to Allstate through interstate wires and the U.S. Mail, and Allstate relied on the faxes and mailings sent by the defendants in paying claims for benefits.

## V.   BILLING FOR SERVICES NOT RENDERED

108.   The defendants regularly submitted bills to Allstate seeking payment for treatment and services that were never rendered to patients at issue herein.

109.   The defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

110.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

111.   Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

112.   Nearly all of the alleged surgeries at issue in this complaint were claimed to have been performed at defendant Fountain View.

113.   Fountain View, which bills only for the alleged provision of the surgical facility and supplies, may only ever properly bill for the procedures actually performed by the surgeons.

114.   However, many of the bills submitted by Fountain View that are at issue in this action are for different and additional procedures than those reported by operative reports and from those billed by surgeons.

115.   The surgeons, including defendants Performance Orthopedics and Swift, also submitted charges for procedures that did not occur.

116.   Patients at issue herein denied receiving the services or equipment billed by the defendants at all.

117. The following are representative examples of the defendants' submission of bills for services that were never actually performed:

- Fountain View billed Allstate for facility fees relative to an alleged two-level lumbar surgery by ISpine to patient K.M. (Claim No. 0495070831)[1] on February 21, 2019. However, at most, only a one-level procedure was performed.

- Fountain View billed Allstate for facility fees relative to an alleged two-level cervical surgery by ISpine to patient R.E. (Claim No. 0528804446) on June 13, 2019. However, at most, only a one-level procedure was performed.

- Fountain View billed Allstate for facility fees relative to injections allegedly performed by ISpine to patient J.F. (Claim No. 0491502597) on September 21, 2018. Fountain View billed for the performance of four (4) separate injections. However, ISpine billed Allstate for just one (1) injection consisting of an epidural to J.F.'s lumbar spine. Of the $11,016 billed to Allstate by Fountain View, $10,066 was for injections that were never performed at all.

- Fountain View billed Allstate for facility fees relative to a procedure allegedly performed by Performance Orthopedics to patient S.M. (Claim No. 0431030659) on March 22, 2018. Performance Orthopedics represented on its bill and associated record that the surgery performed was a left knee meniscectomy. Fountain View billed Allstate for this purported knee surgery, but also billed Allstate an additional $11,125 for a purported shoulder surgery that did not take place at all.

- Performance Orthopedics and Fountain View billed Allstate for alleged procedures to patient S.B. (Claim No. 0493459283) on March 7, 2019 and March 30, 2019. Pursuant to the defendants' predetermined treatment protocol (discussed *infra*), defendant Gulf Coast billed Allstate for allegedly issuing S.B. an intermittent limb compression device. S.B. testified that she did not have this device.

---

[1] To protect the confidentiality of the patients at issue herein, Allstate hereinafter refers to each by his or her initials and Allstate claim number.

- Performance Orthopedics and Fountain View billed Allstate for an alleged procedure to patient J.N. (Claim No. 0481916377) on June 14, 2018. Performance Orthopedics billed Allstate for performing debridement, acromioplasty, an injection, and ultrasonic guidance for an injection. None of these procedures were performed at all, and each charge constitutes a bill for a service not rendered. Fountain View also billed Allstate a facility fee for the acromioplasty, which also constitutes billing for services not rendered since the procedure was not actually performed.

- Performance Orthopedics and Fountain View billed Allstate for an alleged procedure to patient G.G. (Claim No. 0507789220) on June 19, 2019. Performance Orthopedics and Fountain View each billed for several purported components of the surgery, including repair of G.G.'s rotator cuff. However, defendant Swift reported during surgery that when he observed G.G.'s rotator cuff during surgery he "felt [it] to be well-positioned" and no repair was performed. Indeed, Swift testified that G.G.'s "rotator cuff just showed some bruising, but nothing—but no significant tearing." When asked whether G.G.'s rotator cuff required any repair Swift testified, "No, it did not."

- Fountain View, Performance Orthopedics, and Swift billed Allstate for a purported shoulder surgery performed on patient P.H. (Claim No. 0500213178) on August 23, 2018. The bills submitted by Swift include several services that were not performed at all, including debridement and acromioplasty. Swift also submitted at least three (3) separate bills for this alleged procedure: one bill claims the procedure was performed at Performance Orthopedics, one bill claims the procedure was performed at Fountain View, and one bill seeks payment for Swift's services through an entirely different entity called Nextgen Pain Associates and Rehabilitation, LLC. It is only proper to seek payment for professional service once per procedure allegedly performed, and all other bills submitted by the defendants relative to P.H. were for services not performed.

118.   Often, ISpine and Fountain View submitted bills totaling hundreds of thousands of dollars for surgeries that were never noted by patients' other physicians who were providing contemporaneous treatment.

119.   For example, ISpine billed Allstate nearly $100,000 for allegedly performing a two-level cervical total disc replacement surgery on patient T.Y. (Claim No. 0557411600) on January 22, 2020.

120.   The operative report submitted relative to T.Y. claims that Pribil had a nurse practitioner from an entity called Spine & Health PLLC ("Spine & Health") assist with the surgery.

121.   When Allstate contacted Spine & Health to inquire about its alleged treatment, Spine & Health responded stating "[p]atient [T.Y.] does not treat at Spine & Health," thus confirming that no service was actually performed.

122.   Allstate was also sent a prescription form with Pribil's signature ordering ISpine's normal predetermined post-operative DME, but Allstate was never billed by any DME supplier.

123.   The physician who had been evaluating T.Y. every month since his alleged injury conducted a comprehensive evaluation on February 10, 2020, and did not record any reference to T.Y. having undergone a purported major surgery just two (2) weeks prior.

124.   The same physician had also billed for a comprehensive evaluation on January 10, 2020, which was just five (5) days before ISpine allegedly evaluated T.Y. and scheduled him for surgery, and expressly recorded that T.Y. was "[n]ot interested in interventions."

125.   Moreover, the records submitted by this long-term provider contradict those submitted by ISpine, including that T.Y.'s upper-extremity complaints were left-sided, not the right-sided complaints purportedly found by ISpine.

126.   T.Y. was also undergoing a lengthy course of physical therapy during the same time period, and on January 27, 2020, just five (5) days after the alleged surgery, the physical therapist billed Allstate for performing therapeutic exercises to T.Y.'s neck, failed to make any note of T.Y. having undergone major surgery less than a week prior, and expressly noted that T.Y. had "mid to full" range of motion in his neck.

127.   Aside from the standard and boilerplate bills submitted by ISpine and Jenkins, there is no indication from any of T.Y.'s other providers, including those physicians and therapists who were rendering long term care, that T.Y. had undergone any surgical procedure at all.

128.   Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

## VI.    MULTIPLE BILLING FOR IDENTICAL SERVICES

129.   ISpine, Fountain View, Performance Orthopedics, BRR Medical, Gulf Coast, and CCT Medical regularly billed Allstate multiple times for the same purported services.

### A.    MULTIPLE BILLING FOR DME

130.   BRR Medical, Gulf Coast, and CCT Medical routinely submitted charges to Allstate claiming to have issued the same DME to the same patients following the same alleged procedures.

131.   For example, ISpine billed Allstate for an alleged procedure performed on patient B.S. (Claim No. 0516887627) on February 28, 2019, and pursuant to its predetermined DME orders, signed a prescription for an intermittent compression device.

132.   BRR Medical billed Allstate $4,080 for allegedly issuing B.S. an intermittent compression device and stocking on February 28, 2019.

133.   Gulf Coast billed Allstate $4,145 for allegedly issuing B.S. an intermittent compression device and stocking on February 28, 2019.

134.   CCT Medical billed Allstate $7,756 for allegedly renting B.S. a compression device through June 5, 2019.

135.   In total, Allstate was billed $15,981 by three (3) separate defendants for, at most, one (1) item of medically unnecessary DME issued to B.S. that could have been purchased at retail for approximately $240.

136.   When Allstate attempted to obtain information from defendant BRR Medical about its improper double bill, BRR Medical promptly informed Allstate that it "renounced" its charge.  *See* Exhibit 10.

137.   This practice of double- and triple-billing Allstate for the same alleged item of DME was not a mistake, as it was repeated with respect to numerous patients at issue herein, including patients H.M. (Claim No. 0448044602) and K.M. (Claim No. 0495078031), each of whom incurred bills from each of BRR Medical, Gulf Coast, and CCT Medical.  *See* Exhibits 5, 6, and 7.

138.   The triple-billed purported DME issued to K.M. following an alleged surgery on February 21, 2019 was particularly unnecessary, because BRR Medical had already billed for allegedly issuing K.M. the exact same device less than six (6) months prior on September 13, 2018, so she already had the item in her possession.

139.   All bills submitted to Allstate seeking multiple payments for the same alleged services or equipment were fraudulent, and Allstate is entitled to restitution for all such charges it was induced to pay through the defendants' misrepresentations.

### B.   MULTIPLE BILLING FOR PROCEDURES

### 1.   Multiple Billing by ISpine and Fountain View

140.   Every charge submitted by ISpine, and by Fountain View for facility fees associated with alleged surgical procedures by ISpine, included multiple charges for the same purported services.

141.   Every bill for an alleged surgery submitted by ISpine was for one of two (2) predetermined procedures that was performed on every patient regardless of their specific medical need: cervical disc replacement or lumbar laminectomy.

142.   With the exception of several fraudulently unbundled charges discussed below, the bills submitted by ISpine and Fountain View for these alleged procedures always included the same raft of charges.

143.   For cervical disc replacements, ISpine and Fountain View submitted separate bills for the alleged disc replacement, discectomy, fluoroscopy, and use of a microscope.

144.   The Current Procedural Terminology ("CPT") Codes[2] used by ISpine and Fountain View to bill for disc replacements (22856 and 22858) expressly include the performance of discectomies.

---

[2] CPT Codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

145.   A discectomy is the removal of some or all of an intervertebral disc, which is obviously a necessary component of replacing an intervertebral disc.

146.   Thus, every time ISpine and Fountain View billed Allstate using a separate CPT Code for a discectomy in conjunction with a disc replacement, they were seeking payment for a service that was already covered by a different bill, which constitutes fraudulent double billing.

147.   Indeed, the AMA coding guidelines unequivocally state that the codes used by ISpine and Fountain View to bill for discectomies (63075 and 63076) are never to be billed in conjunction with disc replacement CPT Codes.

148.   Similarly, performance of fluoroscopy and use of an operating microscope are included in the charges for disc replacements and discectomies, and are never properly billed with separate charges in addition to those procedures.

149.   In other words, of the four (4) separate charges submitted by ISpine and Fountain View in relation to each vertebral level of every purported cervical spine surgery at issue herein, only one (1) could ever have been proper.

150.   Every bill submitted by ISpine and Fountain View for purported lumbar spine procedures included separate charges for fluoroscopy and purported use of a microscope in addition to charges for laminectomies, which were also always improper and constituted fraudulent multiple charges for the same alleged procedure.

151.   Fountain View also submitted additional charges relative to each purported cervical surgery performed by ISpine using CPT Code 99070 and HCPCS[3] Code L8699, both of which describe supplies purportedly used during the procedure.

152.   Both of these additional charges submitted by Fountain View are included in the cost of the procedure itself, and both charges amount to even more additional bills for the exact same services associated with the underlying procedure.

153.   The bills submitted by Fountain View that amount to multiple charges for the same procedure are staggeringly high.   For example, Fountain View submitted bills for facility fees for a two-level cervical disc replacement surgery relative to patient H.M. (Claim No. 0448044602) totaling $239,304.20.

154.   Of this amount, $87,625 was billed using the CPT Codes for the alleged disc replacement procedure.  The remaining $151,679.20 were multiple charges for the exact same services included in the disc replacement bill, including discectomy, fluoroscopy, use of a microscope, and supplies.

155.   Similarly, Fountain View submitted facility fees totaling $261,807.48 for an alleged two-level cervical disc replacement surgery allegedly performed by ISpine to patient K.E. (Claim No. TXA-0188010) on October 11, 2018.

---

[3] The Healthcare Common Procedure Coding System (HCPCS) is a standardized billing and coding system that supplements the AMA's CPT system.

156.   Of the $261,807.48 billed by Fountain View for this routine outpatient procedure, $174,182.48 was discectomy, fluoroscopy, use of a microscope, and supplies, all of which were fraudulent multiple bills for the same services that were included in Fountain View's charges for the purported disc replacement.

157.   Fountain View also improperly submitted multiple charges for the same purported service relative to procedures performed by other physicians at its facility, including those billed by defendants Performance Orthopedics and Swift at issue herein.

158.   In total, more than $1,254,000 of the charges submitted by Fountain View at issue herein are multiple bills for identical services for the reasons described above.

159.   Similarly, at least $356,000 of the charges submitted by ISpine at issue herein amount to double- and triple-bills for the same alleged procedures, a figure that comprises almost half of all of ISpine's bills.

### 2.   Multiple Billing by Performance Orthopedics and Fountain View

160.   Performance Orthopedics also regularly submitted multiple bills for identical purported services.

161.   Performance Orthopedics and Swift primarily billed Allstate for injections and arthroscopic surgical procedures, almost all of which were also accompanied by bills for facility fees from Fountain View, of which Swift is an

owner so Swift had a clear pecuniary motive to bill for even routine procedures at his Fountain View surgery center when there was no medical necessity for the same.

162.  Performance Orthopedics's and Fountain View's bills for arthroscopic procedures nearly always included claims for ancillary surgical services, such as debridement and diagnostic arthroscopy, in addition to the primary procedure.

163.  These types of ancillary charges are almost never properly billed separately from the primary procedure, because the primary procedure necessarily includes their performance.

164.  Every primary procedure performed arthroscopically necessarily requires arthroscopy, so it is never appropriate to separately bill for such service.

165.  Performance Orthopedics nevertheless improperly double-billed Allstate separately for arthroscopy relative to several patients at issue herein. *See* Exhibit 4.

166.  Debridement is only properly billed as a separate procedure when the surgeon does not also fix the debrided structure.

167.  Performance Orthopedics and Fountain View regularly billed Allstate for purported debridement of the same body part that was the subject of the primary procedure allegedly performed.

168.   For example, Performance Orthopedics billed Allstate for an alleged shoulder surgery to patient P.H. (Claim No. 0500213178) on April 23, 2018 for which the primary procedure was a rotator cuff repair.

169.   In addition to the primary procedure, Performance Orthopedics fraudulently submitted three (3) additional separate charges for purported debridement, lysis of adhesions, and acromioplasty (bone-shaving) of the same area of P.H.'s shoulder that was the subject of the surgery.

170.   Similarly, Performance Orthopedics billed Allstate for an alleged knee surgery to patient D.L. (Claim No. TXA-0221257) on October 2, 2019.

171.   Performance Orthopedics fraudulently billed Allstate using two (2) mutually exclusive CPT Codes that describe removal of D.L.'s meniscus and repair of D.L.'s meniscus.

172.   Further, Performance Orthopedics also billed Allstate for allegedly performing synovectomies in both compartments of D.L.'s knee, which amounts to a double bill for a procedure that was included, if it was performed at all, in the bill for the primary procedure to D.L.

173.   All of these additional charges by Performance Orthopedics were attempts to induce Allstate to pay it more than once for the same alleged procedure.

174.   In addition to these types of multiple bills that were submitted regularly, defendant Swift submitted multiple bills for the same purported surgeries through different businesses.

175.   For example, defendant Performance Orthopedics billed Allstate for the alleged performance of a shoulder surgery to patient Z.T. (Claim No. 0475979290) on September 27, 2018.

176.   Swift also signed a separate bill for the exact same procedure seeking payment on behalf of a clinic called Vital Community Care, P.C. ("Vital").

177.   Fountain View also submitted a bill seeking payment of facility fees for this alleged procedure.

178.   Performance Orthopedics is not entitled to payment for Swift's professional fees for the exact same purported surgery as was billed by Vital.

179.   Moreover, each of the entities that billed for the alleged surgery to Z.T. submitted claims using different CPT Codes, making it impossible to discern what, if anything, was actually performed.

180.   Performance Orthopedics, Fountain View, and Vital also each submitted bills relative to a purported surgery to patient G.G. (Claim No. 0507789220) on June 13, 2019.

181.   As with the bills relative to Z.T., each of the entities used different CPT Codes describing different mutually exclusive procedures relating to G.G.

182.   Swift testified that the bills submitted to Allstate for G.G. were "duplicate bills" and admitted under oath that this was not the first time duplicate bills had been submitted.

183.   All charges submitted by the defendants seeking multiple payments for the same alleged services are fraudulent.

## VII.   <u>UNLAWFUL AND UNLICENSED SERVICES</u>

184.   BRR Medical, Gulf Coast, and CCT Medical billed Allstate for the purported issuance of DME to patients at issue herein without possessing the licensure required by the State of Michigan.

185.   A license from the Michigan Board of Pharmacy is required for all "drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or **issued in this state** . . . ."  Mich. Comp. Laws § 333.17722 (emphasis added).

186.   None of the defendant DME suppliers have obtained the required license from the Michigan Board of Pharmacy.

187.   As described below, the purported DME issued to most of the patients at issue herein by BRR Medical and Gulf Coast was an intermittent limb compression device called PlasmaFlow.

188.   PlasmaFlow devices were approved for use by the Food and Drug Administration ("FDA") through its 510(k) approval process, and the FDA expressly requires a physician prescription for their distribution and use.

189.   Because none of the DME purportedly issued to the patients at issue herein was lawful, none of it was ever compensable pursuant to Michigan's No-Fault Act, and Allstate is entitled to repayment for all unlawful charges it was induced to pay through the defendants' misrepresentations.

## VIII. UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT

190.   The defendants' willingness to bill Allstate for services that were (1) never rendered, (2) double- and triple-billed, and (3) not lawfully provided demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

191.   The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to the patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills to Allstate.

192.   To maximize their financial gain, the defendants adhered to a predetermined protocol causing their patients to undergo unnecessary, indiscriminate, and excessive treatment, as discussed more fully below.

193.   The defendants' treatment violated established standards of care in the medical community, as the vast majority of services, diagnostics, monitoring, and DME were not indicated, redundant, excessive, and repeated without any objectively documented benefit to the patient.

38

194. The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they billed for was not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

195. The unnecessary treatment billed by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 7.

196. All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

197. Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

198. None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

A. **MEDICALLY UNNECESSARY SURGERIES BILLED BY ISPINE AND FOUNTAIN VIEW**

199. ISpine, Fountain View, Pribil, and Barber billed Allstate for surgical procedures that were performed, if at all, solely to generate charges for submission to Allstate.

200. Patients who presented to ISpine for evaluation were almost invariably recommended to undergo surgical procedures at their initial evaluations, regardless of their actual medical conditions and prior treatment.

201. Indeed, ISpine did not even review prior treatment records for the patients for whom it billed Allstate for alleged surgical procedures.

202. Because Pribil does not reside in Michigan and flies to the State only to bill for surgical procedures to generate claims for No-Fault benefits, ISpine's initial evaluations and surgical consultations were often performed by nurse practitioners.

203. As noted above, one ISpine nurse practitioner has testified that layperson Barber was actually in control of determining what patients would receive surgical recommendations.

204. ISpine routinely scheduled patients for surgery without reviewing prior medical records and performing, at most, a single cursory examination.

205. For example, ISpine purportedly evaluated patient F.E. (Claim No. 0451527873) on January 9, 2019, and immediately scheduled her for surgery due to

40

purported findings related to a left-sided cervical disc bulge and left upper extremity complaints.

206. Pribil and ISpine did not order any additional testing or review prior records.

207. Pribil and ISpine falsely claimed that F.E. had "absolutely failed all conservative therapy," when in fact she had not attempted any injections and had not attended a single physical therapy appointment in over fifteen (15) months.

208. When F.E. allegedly presented for surgery on February 7, 2019, Pribil and Malik both inexplicably claimed that F.E.'s complaints were right-sided, in direct contradiction to the purported justification for surgery.

209. ISpine and Fountain View billed Allstate for an alleged lumbar surgery to patient K.M. (Claim No. 0495070831) on February 21, 2019.

210. K.M. had previously undergone a surgical procedure to repair a broken femur in her right leg.

211. ISpine and Pribil scheduled K.M. for surgery at an appointment on January 9, 2019, and the purported evaluation performed on that date did not document a physical examination or include review of any prior medical records related to K.M.'s significant leg injury.

212. The only prior record of K.M. that ISpine claimed to review was an MRI report from a scan that was performed nine (9) months prior that the interpreting radiologist found showed "no significant nerve root impingement."

213. On other occasions, evaluations allegedly performed by ISpine expressly found that additional diagnostic testing was required before it could be determined that a patient required surgery, but ISpine nevertheless billed for such surgeries without waiting for the test results.

214. ISpine, Pribil, and Barber aggressively scheduled patients for surgery without waiting to obtain prior treatment records, without performing thorough examinations or testing, and without attempting conservative care because they needed to generate significant charges during the brief time Pribil was actually in Michigan.

215. Bills for surgeries for patients who did not actually require such invasive care are not necessary and are not compensable under the No-Fault Act, and Allstate is entitled to repayment for all charges it was induced to pay through the defendants' misrepresentations.

## 1. **Improper Use of IONM**

216. ISpine, Pribil, and Barber routinely used medically unnecessary IONM, including the IONM billed by Northwest Neurology and Jenkins, to purportedly determine the medical necessity of surgical procedures.

217.  ISpine and Pribil expressly referred to alleged surgeries billed to Allstate as being "EMG guided" procedures:

| OPERATION: | Lumbar neural foraminotomy L5-S1 right and left with EMG guided procedure. |
| SURGEON: | Stefan Pribil, M.D. |

218.  To the extent that IONM is a medically accepted procedure during spinal surgeries, it is only used to ensure that patients – particularly those with significant comorbidities or complications – do not suffer additional injury during a procedure.

219.  Pribil himself has testified that neuromonitoring is not medically necessary for the type of procedures he performs, stating that "[m]y feeling about intraoperative neuromonitoring has been up until recently that if they have to tell me where I shouldn't be I have no business being a neurosurgeon."

220.  ISpine's former IONM technologist Malik has confirmed during sworn testimony that monitoring patient safety is the appropriate use of IONM, and is what he understood to be the reason that ISpine used his services:

> Q: The neuromonitoring that Delta performed during surgical procedures, what was the purpose of performing that neuromonitoring?
>
> A: Just to make sure the patient was safe during surgery, sir.
>
> Q: Okay.  Was the purpose of the neuromonitoring to make diagnoses in real time during surgery?
>
> A: No, sir.

43

Q: Was the purpose of neuromonitoring to confirm that the surgery was successful or efficacious?

A: No, sir.

Q: The only purpose of neuromonitoring is to confirm patient safety?

A: That is it, sir.  Yes.  Correct.

221.    Malik also explained that the reason that IONM could not be used for the purposes claimed by ISpine (namely, to determine medical necessity during surgery) was because it would be impossible to isolate any physiologic findings from the other stimuli applied during surgery:

Q: And you don't know of any guidelines, or professional societies, or scholarly articles, or journals that says neuromonitoring can be used to do things like confirming whether or not a nerve was decompressed during surgery, right?

A: No.  No, counsel.

Q: And that's because a patient is under anesthesia, they're having their wound irrigated, they're having blood vessels cauterized, they're having a number of different variables during surgery that impact the readings, so they're not detailed enough that you can make any diagnoses like that, right?

A: Correct.

222.    Because ISpine, Pribil, and Barber dangerously rushed patients into surgery to generate charges, they attempted to create the appearance of medical necessity by claiming to use IONM to make diagnoses and confirm efficacy of procedures while they were being performed.

223.   ISpine's claim of using IONM to make diagnoses in the operating room is particularly outrageous, as it never ordered similar electrodiagnostic testing to be performed prior to making surgical recommendations.

224.   Electrodiagnostic testing is a well-accepted extension of a neurologic examination in a non-surgical context, but ISpine never utilized such tests as it would have delayed its bills for unnecessary surgery and would have created records establishing that patients did not have the purported nerve compression that ISpine claimed to justify its procedures.

225.   ISpine did not even bother to ask patients if they underwent prior electrodiagnostic testing, as its standard form omitted any inquiry about such tests:

**Have you undergone any of these tests?**  ☐ CT Scan(s)   ☑ MRI(s)   ☐ Myelogram(s)

If yes, please provide the name where these tests were performed: _____

226.   If ISpine actually believed that electrodiagnostic testing was a proper method to determine medical necessity of surgeries, it would have ordered the procedures to be performed before the surgical determination was already made.

227.   Several patients at issue herein actually underwent electrodiagnostic testing ordered by different providers prior to evaluation by ISpine, but ISpine did use the results of such tests to inform its recommended treatment.

228.   For example, patient T.Y. (Claim No. 0557411600) was directed to undergo electrodiagnostic testing on September 18, 2019 by his treating physician.

229.   T.Y. had significant comorbidities, including kidney cancer that required the surgical removal of a kidney in 2019, and medication-dependent diabetes.

230.   The electrodiagnostic testing allegedly performed on T.Y. on September 18, 2019 revealed abnormalities that were attributed to carpal tunnel syndrome.

231.   ISpine and Pribil did not review the results of this electrodiagnostic testing before scheduling T.Y. for cervical spine surgery on January 22, 2020.

232.   Indeed, T.Y. did not even sign an authorization for ISpine to obtain his medical records from other providers until the same day surgery was scheduled, meaning it was impossible for ISpine to have used such records to inform its decision.

233.   Instead of analyzing the electrodiagnostic testing performed in a clinical setting while T.Y. was awake and alert, ISpine purported to determine the medical necessity of the procedure performed on T.Y. through monitoring performed while T.Y. was under general anesthesia and subject to numerous nerve stimuli that altered any alleged results

234.   Moreover, ISpine and Jenkins did not even attempt to control for T.Y.'s prior diagnosis of carpal tunnel syndrome or his severe diabetes comorbidity, both of which impacted the peripheral nerve function in his upper extremities.

235.   Similarly, Northwest Neurology billed Allstate for an alleged evaluation of patient P.P. (Claim No. TXA-0243918) by Jenkins on January 23, 2020 during which Jenkins expressly stated that P.P. should undergo electrodiagnostic testing to evaluate possible peripheral radiculopathy.

236.   Without waiting for this recommended testing to be performed, ISpine billed Allstate for the alleged performance of a multi-level cervical disc replacement to P.P. just three (3) weeks later, on February 12, 2020.

237.   Despite rushing P.P. to surgery without performing the recommended testing, ISpine claimed that it used the same type of testing performed as a component of IONM to guide the procedure to P.P.

238.   There is no medical support for using IONM for such a diagnostic purpose.

239.   Indeed, there are multitudes of reasons that using IONM to make real-time diagnoses during surgery is impossible, including that the patient is under general anesthesia and therefore does not register a normal reaction to nerve stimuli.

240.   As explained by Malik, normal actions performed during surgery – including cauterization of blood vessels and irrigation of surgical wounds – also cause IONM readings to fluctuate in ways that have nothing to do with the patient's condition.

241.   Moreover, the IONM ordered by ISpine and billed by Northwest Neurology was done pursuant to a predetermined protocol that had nothing to do with actual medical need.

242.   Indeed, Malik expressly referred to the IONM billed to Allstate as a non-patient-specific "standard protocol":

> Q. So this record is incorrect then that Dr. Pribil did not actually request all of these types of monitoring here?
>
> A. No, sir, he did, that's why we put this here.  But, this is my standard protocol that we run.
>
> ***
>
> Q. This battery of six tests, that's the protocol you do for every patient regardless?
>
> A. Yes.

243.   After Malik was replaced by Northwest Neurology and Jenkins, the protocol of IONM purportedly used to make medical decisions during surgery was largely unchanged.

244.   Several of the tests that were included in the defendants' predetermined protocol of IONM and purportedly used by ISpine to make diagnoses could not have actually been interpreted in real time as claimed by ISpine.

245.   One of the IONM techniques regularly billed by Northwest Neurology was somatosensory-evoked potentials ("SSEP") testing.

246.   SSEP is performed by monitoring changes in peripheral nerve signals throughout a procedure.

247.   SSEP testing is not limited to the specific nerves addressed by a procedure, or even the extremities enervated by the targeted spinal level; the readings are taken from all of a patient's extremities and are averaged.

248.   It is generally recognized that a decrease in amplitude of greater than 50% or increase in latency of more than 10% from baseline SSEP readings indicates a change in neurologic status of the patient.

249.   Medical records submitted by ISpine routinely claimed that it observed "dramatic improvement in the SSEPs" during surgical procedures.

250.   However, Malik has testified that "the SSEPs, you don't see dramatic changes because when a nerve is being pinched or compressed, it take [*sic*] a long time for that nerve to show improvement on the SSEPs."

251.   Medical literature regarding SSEPs confirms the same, as it explains that there is a significant delay between any change in a patient's nerve condition and a change in SSEP readings.

252.   In other words, ISpine's operative reports claiming to use SSEP readings to determine the extent of surgery that was reasonable and necessary, or to determine the vertebral levels that required intervention, cannot be accurate,

meaning that there was no basis to perform the surgeries billed to Allstate by the defendants.

253.   Other IONM allegedly performed directly contradicts the representations made by ISpine and Pribil.

254.   For example, for nearly every patient at issue herein who was subjected to medically unnecessary IONM, Malik reported that EMG readings were "quiet" at baseline.

255.   As explained by Malik during sworn testimony, an EMG reading that is described as quiet is a normal reading and cannot be improved upon:

> Q. It says right here, EMGs were quiet at baselines.  Do you see that?
>
> A. Yes.
>
> Q. That's a normal reading; right?
>
> A. Yes.
>
> Q. You can't improve on quiet at baselines?
>
> A. No, you can't. They're quiet, they're quiet.

256.   ISpine routinely falsely represented that patients' EMG readings improved during surgery, when the baseline readings were completely normal.

257.   These false representations, several of which are exemplified below, are particularly egregious, because they confirm that there was never a medical necessity for the alleged surgical procedures to begin with:

- Patient K.M. (Claim No. 0495070831) was noted by Malik to have EMG readings that "were quiet at baselines" and that there were no significant changes during the procedure. The record of the evaluation at which ISpine recommended that K.M. undergo surgery expressly stated that the procedure would be guided by the EMG readings taken during the procedure. Because the EMG readings were normal, the surgery should have never been performed at all. In order to attempt to manufacture justification for the more than $299,600 billed by ISpine and Fountain View, ISpine and Pribil falsely reported that there were EMG "abnormalities" that ceased during surgery.

- Patient K.H. (Claim No. 0550821920) purportedly had IONM performed by Northwest Neurology and Jenkins for his November 13, 2019 surgery by ISpine. Jenkins reported that she only obtained a baseline EMG reading for K.H.'s C5-6 vertebral level. Pribil's operative report falsely claims that K.H. had an abnormal EMG baseline at the C3-4 vertebral level, which was not even tested by Jenkins.

258. Not only was IONM used to improperly fabricate medical necessity, it was not appropriate or medically necessary even for its accepted purpose of monitoring patient safety for the patients at issue herein.

259. The American Academy of Neurology has issued guidance stating that "[i]ntraoperative monitoring is not medically necessary in situations where historical data and current practices reveal no potential for damage to neural integrity during surgery. Monitoring under these circumstances will exceed the patient's medical need."

260. The defendants never identified any medical reason that the patients at issue herein required IONM to monitor safety for the routine and protocol outpatient surgeries they allegedly performed.

261.   Indeed, because the defendants expressly billed for IONM for the improper and unsupported purpose of making diagnoses during surgery, they never even intended IONM to be used for a medically appropriate purpose, and the bills submitted by Northwest Neurology and Jenkins could not have been for a reasonably necessary service.

### 2.   Specific Examples of Unnecessary Surgeries

262.   The following are representative exemplars of bills for surgical procedures by ISpine and Fountain View that were medically unnecessary:

- ISpine and Fountain View billed Allstate for an alleged cervical spine procedure to patient J.M. (Claim No. 0479909185) on October 4, 2018. J.M. had presented for evaluation at ISpine just eight (8) days prior, at which point Pribil expressly stated that electrodiagnostic testing would need to be conducted to determine the level of surgery. No electrodiagnostic testing was performed until J.M. was placed under anesthesia and the alleged surgery was underway. Moreover, the IONM that was allegedly performed on J.M. found that his EMG readings were "quiet," which means there was no medical justification for surgery provided by the test.

- ISpine and Fountain View billed Allstate for an alleged lumbar procedure to patient K.M. (Claim No. 0495070831) on February 21, 2019. Pribil performed the purported evaluation that resulted in the surgery on January 9, 2019, and expressly noted that electrodiagnostic testing would be required to determine which vertebral level needed to be addressed. No electrodiagnostic testing was performed prior to surgery, and the IONM that was allegedly performed after K.M. was placed under anesthesia and the surgery had begun cannot and does not establish the medical necessity of the surgery.

- Patient P.S. (Claim No. 0461166407) presented for an evaluation at ISpine with Pribil on April 25, 2018 for injuries related to an alleged accident that took place on June 21, 2017. Pribil noted that P.S. did not have a recent MRI and that one would be needed before making a determination about surgery. On April 26, 2018, a day after Pribil's alleged evaluation, ISpine billed

Allstate for a laminectomy.  Moreover, the operative report prepared by Pribil falsely states that  "[b]aseline electrophysiological monitoring revealed EMG abnormal action potential activity at the L4-5 level and L5-S1 level" when the actual IONM report states only that "typical transient EMG discharges and artifacts associated with surgical and positional manipulation were observed."

- ISpine and Fountain View billed Allstate for an alleged cervical procedure to patient B.S. (Claim No. 0516887627) on February 28, 2019.  Pribil allegedly performed an evaluation of B.S. on February 20, 2019, but he failed to review B.S.'s extensive records of prior treatment.  Pribil stated that IONM would be used to determine what vertebral levels to address during surgery.  The IONM was performed by Malik, who reported that B.S.'s EMG readings were "quiet" (i.e., normal).  Moreover, Malik's IONM report indicates that the EMG needles were not even placed in B.S.'s upper extremities, meaning that Pribil could not have confirmed anything about a cervical procedure through their readings.

### B.   MEDICALLY UNNECESSARY SERVICES BILLED BY NORTHWEST NEUROLOGY

263.   In addition to the improper and medically unnecessary purported IONM that was billed in conjunction with procedures billed by ISpine and Fountain View, defendants Northwest Neurology and Jenkins independently submitted charges to Allstate for alleged tests and procedures that had no medical purpose.

264.   The most frequently billed service by Northwest Neurology was for the alleged performance of ambulatory electroencephalograms ("EEG").  *See* Exhibit 3.

265.   Ambulatory EEGs are tests that are used to detect seizures and to confirm diagnoses of epilepsy.

266.   None of the patients at issue herein were seeking treatment from the defendants for seizures or epilepsy causally related to motor vehicle accidents.

267.   Patients for whom ambulatory EEGs were ordered were often not reported to have even experienced headaches or suspicion of concussion except a conclusory statement or diagnosis added to the record by Northwest Neurology.

268.   Northwest Neurology's billing for ambulatory EEGs was not only medically unnecessary for the types of symptoms reported by patients, the alleged EEGs were done in disregard for the appropriate course of care, which calls for a traditional, in-office EEG to be performed before subjecting a patient to a days-long test.

269.   The methodology allegedly used by Northwest Neurology was to attach the equipment to a patient's head and direct him or her to keep the equipment on for several days while performing normal activities.

270.   Northwest Neurology never documented the actual application or removal of the EEG test equipment, nor the instructions provided to patients regarding its use.

271.   The ambulatory EEGs for which Northwest Neurology billed Allstate, if performed at all, were never medically necessary.

272.   The second most frequently billed procedure by Northwest Neurology was for the alleged interpretation of ambulatory EEG test results using CPT Code 95957.  *See* Exhibit 3.

273.   CPT Code 95957 is only appropriately used when a physician must analyze "spikes" in the data recorded during an EEG, and only when a patient is diagnosed with intractable epilepsy.

274.   None of the patients at issue herein were diagnosed with intractable epilepsy, and therefore none of the claims submitted by Northwest Neurology using CPT Code 95957 were ever medically necessary or appropriate.

275.   The third most frequently billed procedure by Northwest Neurology was for the alleged performance of transcranial Doppler arterial examinations.  *See* Exhibit 3.

276.   Transcranial Doppler examinations are used to evaluate and diagnose conditions such as strokes and aneurysms; they are not used as a matter of course in the treatment of patients who have reported minor motor vehicle accidents.

277.   These three (3) bills – ambulatory EEG, spike analysis, and transcranial Doppler examinations – constitute a predetermined battery of tests that was ordered for nearly every patient who presented to Northwest Neurology and Jenkins beginning in or about 2018.

278.   The purported evaluations billed by Northwest Neurology at which these medically unnecessary tests were ordered were also necessarily unreasonable, as they were performed only to create the appearance of propriety for these pointless tests.

279.   Northwest Neurology also billed Allstate using CPT Code 99354 representing that it performed a "prolonged" evaluation above and beyond normal office evaluations.

280.   CPT Code 99354 signifies that an additional hour of direct patient contact beyond the normal examination time was performed, and may not be billed at all if thirty (30) minutes or less of prolonged services were performed.

281.   There was no medical reason that an additional hour of patient contact was required for the routine evaluations billed by Northwest Neurology, and there is no indication that this service was even performed at all.

282.   For example, Northwest Neurology billed Allstate an extra $500 for an alleged additional hour of direct patient contact with patient A.H. (Claim No. 0490104270) on June 3, 2019 for an appointment that did not involve taking any new medical history, performing any new tests, prescribing any new medications, or changing A.H.'s treatment plan in any way.

283.   The following are representative exemplars of bills for medically unnecessary tests and procedures billed by Northwest Neurology:

- Patient S.N. (Claim No. 0532651064) was eighteen (18) years old when he alleged to have been involved in a motor vehicle accident on January 18, 2019. S.M. reported that he did not lose consciousness during the alleged accident and did not complain of any symptoms suggestive of a traumatic brain injury. Nearly five (5) months after the alleged injury, on June 14, 2019, Northwest Neurology billed for performing a transcranial Doppler examination. There was no indication that S.M. was suffering from an arterial blockage, or even complaining of any symptoms that could be caused by such a condition.

Predictably, the results of this test were entirely normal.   Northwest Neurology then proceeded to bill Allstate for the alleged performance of a 48-hour ambulatory EEG performed from June 19, 2019 to June 21, 2019.  S.M. had not undergone a traditional in-office EEG prior to this procedure, and there was no suspicion that he was suffering from epilepsy.  However, in addition to the $8,000 billed by Northwest Neurology for performing the medically unnecessary test, it also submitted an additional $3,000 for purported spike analysis using CPT Code 95957.  Not only was this charge improper based on S.M.'s non-epileptic condition, there were no spikes to analyze from the normal EEG results.

- Northwest Neurology first billed Allstate for a purported evaluation of patient A.H. (Claim No. 0490104270) on May 2, 2019, which was more than fifteen (15) months after A.H. claimed to have been in a motor vehicle accident on January 24, 2018.  Northwest Neurology falsely reported that A.H. had lost consciousness during her alleged accident, which is flatly contradicted by A.H.'s report to the emergency room physician on the date of the alleged accident where she reported that not only did she not lose consciousness, she did not even strike her head.  It was not suspected that A.H. had seizures, epilepsy, or any other significant neurologic condition, and no further testing was ordered.  Northwest Neurology billed for a second evaluation of A.H. on June 3, 2019, at which no new diagnoses were made and no tests were ordered.  Northwest Neurology then inexplicably billed Allstate for a 72-hour EEG that was allegedly performed from June 7 to June 10, 2019.  A.H. had not undergone any in-office EEG, nor any other type of neurologic test, before Northwest Neurology billed Allstate $12,000 for this completely unnecessary procedure.  As per its protocol of submitting unnecessary ancillary charges, Northwest Neurology also billed Allstate for allegedly performing a spike analysis of the EEG results despite expressly reporting they showed "[n]o epileptiform activity."  The EEG test results were predictably normal.  Then, again with no explanation or medical justification, Northwest Neurology billed Allstate for the alleged performance of a visual evoked potential study on June 15, 2019, which was also completely normal as there was never any reason to perform it in the first place.

- Patient N.E. (Claim No. 0448838532) was allegedly involved in a motor vehicle accident on March 10, 2017.  More than a year later, on March 28, 2018, Northwest Neurology billed for an initial evaluation allegedly performed by defendant Jenkins.  Jenkins diagnosed N.E. with just a "mild" injury, but nevertheless ordered extensive testing pursuant to Northwest

Neurology's protocol of unnecessary services, including a transcranial Doppler examination and an ambulatory EEG. Northwest Neurology submitted a bill for an alleged transcranial Doppler examination, but claimed that it was performed on January 2, 2018, nearly three (3) months prior to Jenkins' purported evaluation. Northwest Neurology billed for performing an EEG on N.E., but not until April 6 to 9, 2019, more than another year after the test was supposedly ordered, which further confirms it was never medically necessary.

## C.   MEDICALLY UNNECESSARY DME

284.   In order to further increase the amount of charges submitted to Allstate, the defendants prescribed medically unnecessary DME as a matter of course following alleged procedures.

285.   According to the testimony of Dianne Ehlert, N.P., a former nurse practitioner for ISpine, individual medical need was not considered when ordering DME, but rather there was a standing order that every patient be prescribed equipment:

> Q. Well, is that a determination that you made that all patients should have that DME?
>
> A. Oh, no, that was a standing order...

286.   ISpine's predetermined order for DME included compression stockings and intermittent compression devices that were often double- and triple-billed by defendants Gulf Coast, BRR Medical, and CCT Medical, as discussed above.

287.   The records submitted in an attempt to justify these exorbitant charges claim that the DME was prescribed as a prophylaxis for deep-vein thrombosis

("DVT"), but the patients to whom the DME was prescribed did not have risk factors for developing DVT.

288.   Indeed, the pre-printed forms submitted by the defendants include a "DVT Risk Assessment" with each risk factor assigned a point score with the total point score determining whether the claimant is at high risk (three (3) points and higher) or moderate risk (two (2) points).

289.   The medical records submitted by the defendants do not match the risk factors reported to justify post-surgical DME.

290.   For example, D.D. (Claim No. 041441198) allegedly underwent a procedure performed at Fountain View on December 7, 2017, following which BRR Medical billed Allstate for DME that was allegedly issued pursuant to the defendants' predetermined protocol.

291.   According to the risk assessment on BRR Medical's prescription form, D.D. was at high risk for DVT with four (4) points, including because she purportedly had general anesthesia during surgery.

292.   This representation is contradicted by the medical record submitted to Allstate, which clearly states that there was no IV sedation used on D.D. and that only local anesthesia of lidocaine was used.

293.   Further, according to the anesthesia record, D.D. was brought into the operating room at 8:01 and the procedure ended at 9:00, meaning the procedure lasted 59 minutes.

294.   In order to falsely increase the supposed DVT risk factors, the BRR Medical prescription form states that D.D. had "Major Surgery (>60 Minutes)." This assertion provides two (2) risk factor points.

295.   These misrepresentations increased D.D.'s DVT risk assessment to four (4) points, when it should have been one (1).

296.   According to BRR Medical's own documents, a risk assessment of one (1) point would not even put D.D. at moderate risk for DVT and issuance of an intermittent compression device would be medically unnecessary.

297.   Allstate was billed $4,895 for the medically unnecessary DME allegedly issued to D.D. based on this fabricated form.

298.   Not only were these intermittent compression devices not medically necessary for the patients at issue herein, they were often contraindicated.

299.   As noted above, BRR Medical and Gulf Coast billed Allstate for the alleged issuance of a device called PlasmaFlow that was approved through the FDA's 510(k) program.

300.   The manufacturer submitted information to the FDA, which was incorporated into the product's approval, stating that it "_must not_ be used to treat . . . patients with neuropathy" (emphasis original).

301.   Several of the patients who were purportedly issued intermittent compression devices by the defendants were documented to have peripheral nerve comorbidities, including complex regional pain syndrome and carpal tunnel syndrome, that were not evaluated and that should have prevented their use of such DME.

302.   Medical records submitted by other physicians also confirm that patients did not use (and therefore never actually needed) the DME allegedly issued.

303.   For example, BRR Medical, Gulf Coast, and CCT Medical all submitted bills to Allstate for allegedly issuing the same compression device to patient K.M. (Claim No. 0495070831).

304.   BRR Medical and Gulf Coast billed for allegedly issuing this device on February 21, 2019, and CCT Medical billed for allegedly issuing the device on February 23, 2019.

305.   Following her purported surgery on February 21, 2019, K.M. was evaluated by a home nurse and/or a home therapist on February 22, 23, 25, and 28, 2019, and March 4 and 7, 2019.

306.   These home care providers submitted detailed documentation of assisting K.M. with medications, dressing her surgical wound, and assisting with daily activities, and never once reported that K.M. was using a compression device.

307.   The intermittent compression device billed by BRR Medical and Gulf Coast was charged to Allstate using HCPCS Code E0676.

308.   The defendants always issued new devices to patients, despite the fact that they were never intended to be used for long periods of time.

309.   To the extent compression therapy is ever medically necessary in the absence of actual concern for DVT, which has not been proven in studies of clinical outcomes, such treatment is only appropriate for short periods of time.

310.   When treatment is only required for short periods of time, medical providers can and should provide DME to patients on a rental basis, as it is unnecessary for a patient to permanently own an expensive piece of equipment that is only used for days.

311.   Devices that are issued to patients on a permanent basis should be expected to last for at least three (3) years pursuant to government guidelines.

312.   Because the defendants pressured patients into medically unnecessary surgeries to maximize their charges, many patients at issue herein were subjected to the defendants' predetermined protocol of DME on multiple occasions.

313.   Rather than directing patients to use the DME that had already allegedly been issued, in some cases just months prior, the defendants claimed to issue entirely new DME and billed Allstate thousands of additional dollars for the exact same devices patients already had.

314.   Many of the bills submitted to Allstate by defendant Gulf Coast represent that DME was ordered by someone named Myrlynn Delille, who is not identified on any other medical record submitted relative to patients at issue herein.

315.   Equipment ordered by a physician who had no involvement in the medical care of the patients to whom the DME was allegedly issued cannot be medically necessary.

316.   The following are representative exemplars of bills for DME that was medically unnecessary and/or redundant:

- Fountain View billed Allstate for an alleged shoulder surgery performed by defendant Swift on patient P.H. (Claim No. 0500213178) on February 28, 2019.  Pursuant to the defendants' predetermined DME orders, Gulf Coast billed Allstate $5,995 for allegedly issuing P.H. an intermittent compression device on the same date.  BRR Medical had also billed Allstate for allegedly issuing the exact same device just six (6) months prior on August 23, 2018. P.H. already had an intermittent compression device and the issuance of a second identical device by defendant Gulf Coast was unreasonable and medically unnecessary.

- As detailed *supra*, Fountain View and ISpine billed Allstate for an alleged procedure on J.M. (Claim No. 0479909185) on October 4, 2018.  J.M. also purportedly underwent an additional procedure performed by ISpine on October 26, 2018.  Defendant BRR Medical billed Allstate for purportedly issuing J.M. the exact same intermittent compression device following each of these procedures that took place just three (3) weeks apart from one another.

63

Then, on February 19, 2019, Fountain View billed Allstate for yet another procedure to J.M. and defendant Gulf Coast billed for allegedly issuing a third intermittent compression device.

## IX. <u>FRAUDULENT BILLING</u>

317. Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

318. The defendants failed to meet this responsibility and instead submitted bills for unreasonable payments to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

319. The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

320. The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

321. Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

A.   FRAUDULENT UNBUNDLING

322.   The federal government instituted the National Correct Coding Initiative ("NCCI") to promote national correct coding methodologies and to control improper coding leading to inappropriate payment.

323.   NCCI works to ensure a provider does not bill separately for individual components of a procedure that are included in another billing code also billed for the same date of service, also known as "unbundling."

### 1.   Unbundled Surgery Charges

324.   Every charge submitted by ISpine and Fountain View for alleged surgical procedures was fraudulently unbundled.

325.   The multiple billing by ISpine, Fountain View, and Performance Orthopedics for every surgical procedure at issue herein, as detailed above, was a particularly egregious and pervasive form of fraudulent unbundling by the defendants, but ISpine and Fountain View also frequently unbundled other charges submitted to Allstate.

326.   The defendants submitted fraudulently unbundled charges for "spinal exploration" during surgery using CPT Code 22830.

327.   Exploration of the area of the body that is being subjected to a comprehensive surgical procedure is expected to be performed as part of such procedure, and is not to be billed separately.

328.   ISpine also improperly submitted charges to Allstate for equipment used during surgical procedures, which is a charge that is properly submitted, if at all, by the facility.

329.   For example, ISpine billed Allstate $45,000 on top of its professional services for the cost of the equipment allegedly used during a procedure to patient K.M. (Claim No. 0495070831) on September 13, 2018.

330.   As discussed above, Fountain View also submitted fraudulently unbundled charges for ordinary equipment purportedly used during surgeries.

331.   Fountain View and Performance Orthopedics billed Allstate for experimental platelet rich plasma injections in association with surgeries at issue herein using CPT Code 0232T.

332.   Separate bills for platelet rich plasma injections are only proper when they are standalone procedures or when they are performed to a different body part than that which is addressed by the surgery.

333.   All of the charges submitted by Fountain View and Performance Orthopedics for platelet rich plasma injections were in conjunction with an alleged surgery and to the same body part as the alleged surgery.

334.   Therefore, all of the claims submitted by Fountain View and Performance Orthopedics using CPT Code 0232T were fraudulently unbundled.

335.   All charges submitted by the defendants seeking multiple payments for the same alleged services are fraudulent.

### 2.   Unbundled DME Charges

336.   As discussed above, the defendants' predetermined DME orders included expensive and medically unnecessary intermittent compression devices that were billed using HCPCS Code E0676.

337.   When a charge is submitted using HCPCS Code E0676, it includes "[t]he appliance(s) and any other accessories, options and supplies used with" the device.

338.   Supplies used with compression devices expressly include compression stockings, which BRR Medical and Gulf Coast regularly billed separately.  *See* Exhibits 5 and 6.

339.   Gulf Coast also routinely submitted charges of at least $900 for additional components allegedly used in conjunction with compression devices, all of which were fraudulently unbundled.  *See* Exhibit 6.

### B.   FRAUDULENT USE OF CPT CODE MODIFIERS

340.   CPT Code modifiers are used to indicate to payors that a service or procedure has been altered by some specific circumstance.

341.   The CPT Code modifier that was most frequently abused by the defendants was modifier 59, which is used to report that charges that are ordinarily

not permitted to be submitted together are proper because there was a separate patient encounter or procedure on the same date of service.

342.   Appending modifier 59 to CPT Codes indiscriminately is a deceptive practice intended to bypass claim adjudication systems that would detect fraudulent unbundling.

343.   Indeed, the federal government has released a publication warning providers that CPT Code modifier 59 was being overused and was associated with cases of fraud and abuse.

344.   ISpine regularly used CPT Code modifier 59 to falsely represent that services, such as use of a microscope, were performed separately from the alleged procedure.

345.   Fountain View also routinely submitted bills to Allstate using CPT Code modifier 59 to create the appearance of separate procedures when in fact only one service, at most, was performed.

346.   Performance Orthopedics used CPT Code modifier 59 in an attempt to avoid detection of improper separate charges for purported services like debridement that were performed on the same body part as the primary surgical procedure.

347.   The defendants' use of CPT Code modifier 59 was an intentional misrepresentation that was made specifically to elude reviews of their billing that would have identified their charges as improper.

## C.   OTHER FRAUDULENT BILLING PRACTICES

348.   Defendants Northwest Neurology and Jenkins submitted claims to Allstate using HCPCS Code G8553, charging Allstate $100 on each occasion. *See* Exhibit 3.

349.   HCPCS Code G8553 was a code that was briefly used by the Centers for Medicare & Medicaid Services to incentivize physicians to use and to track electronic prescription services in the early 2010s.

350.   HCPCS Code G8553 was discontinued in 2014.

351.   Moreover, HCPCS Code G8553 never described a separately billable service; it was reported by providers for a 2% payment adjustment for their Medicare Part B services.

352.   All of the charges by Northwest Neurology and Jenkins using HCPCS Code G8553 were submitted years after the code was deleted, and none of the charges describe any service that was ever actually billable. Id

353.   ISpine routinely submitted bills using a place of service code representing that alleged treatments were performed at its office rather than at ambulatory surgery centers like Fountain View.

354.   The federal government has issued guidance explaining that such misidentification of the place of service is improper and problematic because payment rates for services performed in-office are higher than if the same services

are performed in a separate facility (where the facility submits a separate charge to cover the space, support staff, and supplies).

355.   ISpine's misrepresentation of the location of services allegedly performed was intended to maximize the amount of payment from Allstate despite not actually providing any of the support services or supplies that would justify a higher rate of payment.

356.   Defendant Fountain View also failed to report required modifiers with its bills that would have alerted Allstate that a reduction in price was required.

357.   For example, Fountain View billed Allstate for a facility fee for the alleged removal of a spinal cord stimulator from patient C.S. (Claim No. 0349217083) on February 2, 2018, and submitted separate charges for the removal of the implanted electrodes and the power generator.

358.   To the extent that separate billing is permissible at all for this procedure, the removal of the generator is required to be billed using CPT Code modifier 51 to alert the payor that it is a subsequent component of the primary procedure and should be paid at a rate of fifty percent (50%).

359.   Fountain View did not submit its bill using CPT Code modifier 51 and instead sought payment for the full amount for the alleged procedure.

360.   The defendants' improper manipulation of the medical billing and coding system was part of their intentional effort to induce Allstate to make payment

on claims that were never compensable, and to extract higher payment amounts from Allstate than the defendants were entitled, and Allstate is entitled to repayment of all amounts it was induced to pay by these fraudulent billing practices.

## X.   EXCESSIVE AND UNREASONABLE CHARGES

361.   Each of the defendants routinely billed Allstate at rates that were unreasonable and had no relation to the services allegedly performed.

### A.   EXCESSIVE AND UNREASONABLE CHARGES FOR PROCEDURES

362.   The amounts the defendants billed Allstate for the routine and outpatient procedures at issue herein were outrageous and far exceed the reasonable amount that is permitted to be charged by the No-Fault Act.

363.   As discussed above, the defendants did not need Allstate to pay their outrageous charges in order to profit from their fraudulent bills, as they sold and assigned the rights to collect their accounts receivable to third parties for a fraction of the amounts charged immediately after each date of service.

364.   ISpine accepted just twenty-one percent (21%) of the amount billed to Allstate from Velocity as payment in full for many of the charges at issue herein, and similar rates were paid by other purchasers of accounts receivable and accepted by the defendants.

365.   Defendant Barber increased his personal profit by billing extreme amounts through his kickback agreements with the purchasers of the defendants'

accounts receivable, including the agreement whereby Barber personally received five percent (5%) of the amount of ISpine accounts receivables sold.

366.   Thus, ISpine, Pribil, and Barber all had significant financial incentive to bill for as much treatment as possible without any regard for patient need and standards of care in the medical community.

367.   Pribil has also testified that factors used to choose these unreasonable charge amounts include the "cost of flying," that "this takes me away from my family," and the fact that he "ha[s] to utilize an attorney."

368.   As detailed above, Pribil voluntarily set up his business in Michigan to take advantage of its unlimited No-Fault benefits; the expenses he may have incurred to perpetrate this scheme are not a proper consideration for reasonable bill amounts.

369.   Pribil has also falsely testified that part of ISpine's unreasonable charge amounts are to compensate him for being "woken up every moment of the night" to see patients in the emergency room.

370.   This scenario does not occur as Pribil returns to Florida every week immediately after allegedly performing the unnecessary procedures described herein.

371.   Indeed, former ISpine nurse practitioner Lilly-Bernau testified that because Pribil is not available for patients who needed urgent care, such patients had to be taken to the emergency room.

372.  For example, patient D.C. (Claim No. 0461245755) developed complications the day after his procedure and because he was unable to reach Pribil for direction, he was forced to seek treatment at a hospital.

373.  Each of the routine outpatient surgeries billed by ISpine resulted in hundreds of thousands of dollars of unreasonable charges submitted by the defendants and their co-conspirators.

374.  For example, the following chart documents the charges submitted relative to a routine outpatient cervical procedure to patient H.M. (Claim No. 0448044602) and exemplify the unreasonable charges for all similar procedures at issue herein:

| Provider | Bill Amount |
|---|---|
| ISpine | $98,920.00 |
| Fountain View | $239,304.20 |
| BRR Medical | $4,080.00 |
| Gulf Coast | $5,135.00 |
| CCT Medical | $7,353.00 |
| IONM | $24,372.85 |
| Anesthesia | $11,253.00 |
| Total Charge | **$390,418.05** |

375.  The chart below depicts the charges submitted relative to a routine outpatient lumbar procedure to patient K.M. (Claim No. 0495070831) that took less than two (2) hours to perform, and exemplify the unreasonable charges for all similar procedures at issue herein:

| Provider | Bill Amount |
|---|---|
| ISpine | $74,920.00 |
| Fountain View | $224,680.10 |
| BRR Medical | $4,080.00 |
| Gulf Coast | $4,295.00 |
| CCT Medical | $7,596.00 |
| IONM | $21,562.86 |
| Assistant Surgeon | $18,730.00 |
| Anesthesia | $15,958.00 |
| Total Charge | **$371,821.96** |

376.   For several of the procedures at issue herein, the defendants caused even more charges to be submitted, including for unnecessary surgical assistants, home care, and follow-up evaluations.

377.   Post-operative evaluations and care are intended to be included in the cost for the procedure itself, in what is referred to by billing regulations as the "global surgery package."

378.   Because Pribil immediately left the State of Michigan after allegedly performing the procedures at issue herein, the post-operative evaluation and care of the patients at issue herein had to be performed by other providers, and therefore resulted in thousands of dollars of additional charges submitted to Allstate.

379.   The defendants' unreasonable charge amounts were selected to maximize the amount obtained from purchasers of accounts receivable and Allstate, and were based on improper factors that led to total charge amounts that were many times higher than what other providers charge for the same procedures.

380.   For example, a study published in 2018 found that the nationwide average cost of cervical disc replacement procedures was $13,197, which is just three percent (3%) of the amounts routinely billed by the defendants.  *See* Comron Saifi M.D., *et al., Trends in resource utilization and rate of cervical disc arthroplasty and anterior cervical discectomy and fusion throughout the United States from 2006 – 2013,* 18 THE SPINE JOURNAL 1022-1029 (2018).

381.   Similarly, an article published in August 2017 surveyed the costs of lumbar laminectomies for 181,267 patients throughout the country, and found that the average cost was $11,405, which is also just three percent (3%) of the amounts routinely billed by the defendants.  Corinna C. Zygourakis, M.D., *et al*., *Geographic and Hospital Variation in Cost of Lumbar Laminectomy and Lumbar Fusion for Degenerative Conditions*, 81 NEUROSURG 331-340 (2017)

382.   Pribil owns a clinic in Florida called Atlantic Coast Brain & Spine Institute, LLC ("Atlantic Coast"), which he uses to bill Allstate for the same alleged procedures in Michigan that are at issue herein.

383.   The cost difference between what is charged for Pribil's services in Florida (which has first-party insurance benefits that are capped at between $2,500 and $10,000) as compared to Michigan (which has unlimited first-party insurance benefits and no fee schedule) is further evidence of the defendants' intentional targeting of Allstate with bills that are patently unreasonable.

384.   For example, Atlantic Coast's fraudulently unbundled charges for use of a microscope during surgery were always $786, but in Michigan ISpine's charges for use of a microscope were always at least ten (10) times higher with a minimum charge of $7,920.  *See* Exhibit 1.

385.   There is nothing different about the microscope or the process of using it in Michigan; ISpine multiplied its charge to abuse the unlimited benefits available under the Michigan No-Fault Act.

386.   ISpine never incurred any cost associated with the microscope purportedly used during surgeries at Fountain View, as Fountain View's owner has testified that the microscope was purchased (used) when the facility opened and before ISpine began using its operating suites.

387.   Similarly, Atlantic Coast's fraudulently unbundled charges for alleged fluoroscopic guidance during surgery were always $250, while in Michigan ISpine always submitted charges for fluoroscopic guidance of at least $2,000 per procedure. *See* Exhibit 1.

### B.   EXCESSIVE AND UNREASONABLE CHARGES FOR DME

388.   As noted above, Gulf Coast and BRR Medical routinely billed Allstate for issuing new DME to patients who could never have required treatment for more than several days.

389. The PlasmaFlow device purportedly issued by Gulf Coast and BRR Medical can be purchased new, at retail, for approximately $240.

390. Gulf Coast and BRR Medical billed Allstate at least $3,995 each time they allegedly issued this device to the patients at issue herein since October 2018. *See* Exhibits 5 and 6.

391. BRR Medical's charges for intermittent compression devices inexplicably nearly tripled between August 2018 and October 2018, and more than quadrupled from the $950 it charged for the same devices prior to 2018. *See* Exhibit 5.

392. Gulf Coast raised its charge for the same device to an even more unreasonable $5,995 in March 2019. *See* Exhibit 6.

393. These charges – which are sixteen (16) to twenty-five (25) times the retail cost for the devices purportedly issued – are unreasonable under the No-Fault Act.

394. Unlike Gulf Coast and BRR Medical, CCT Medical regularly billed Allstate for purported rentals of DME.

395. However, CCT Medical's charges are even more unreasonable than Gulf Coast and BRR Medical, because it billed between $81 and $120 a day for ninety (90) day periods. *See* Exhibit 7.

396.   These charges amount to bills totaling nearly $2,500 per month, and $7,500 per unnecessary ninety (90) day period ordered pursuant to the defendants' predetermined protocol.

397.   By comparison, the Medicare payment amount for the same device is $108.03 per month, or approximately one-thirtieth (1/30) of the amount billed to Allstate by CCT Medical.

398.   The amounts of the defendants' charges have no relationship to the cost or value of the services allegedly performed, and they were selected only to maximize the amount of charges to Allstate (and therefore the amounts obtained through the sale of their accounts receivable, as the sales of the accounts receivable were based on a percentage of the total amount billed).  Unreasonable charges are not compensable under the No-Fault Act and Allstate has no obligation to pay the defendants the outrageous amounts billed.

## XI.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

399.   To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they billed were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

78

400.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

401.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

402.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

403.   There are no less than eleven (11) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

   a. Fountain View and Performance Orthopedics routinely billed for surgical procedures that were not performed at all.

   b. ISpine, Fountain View, Performance Orthopedics, BRR Medical, Gulf Coast, and CCT Medical regularly billed Allstate multiple times for the same DME and services.

   c. BRR Medical, Gulf Coast, and CCT Medical unlawfully billed Allstate for the purported issuance of DME to patients at issue herein without possessing the licensure required by the State of Michigan.

d.   ISpine and Fountain View billed Allstate for medically unnecessary surgeries based on the improper and unsupported use of IONM as diagnostic.

e.   Northwest Neurology routinely billed Allstate for medically unnecessary and contraindicated neurologic tests, including transcranial Doppler examinations and ambulatory EEGs, which are used to detect strokes, seizures, and other severe conditions that were never suspected for the patients at issue herein.

f.   The defendants used an unlawful predetermined treatment protocol that included ordering unnecessary procedures, testing, IONM, and DME. This predetermined protocol is confirmed by the nearly identical billing and treatment plans ordered for patients at issue in this Complaint, which have no relationship to medical necessity or any patient-specific considerations.

g.   Gulf Coast, BRR Medical, and CCT Medical billed Allstate for medically unnecessary and contraindicated DME in furtherance of the defendants' predetermined treatment protocol to bill Allstate for as many ancillary services as possible for profit and not based on individual patient need.

h.   ISpine, Fountain View, Performance Orthopedics, BRR Medical, and Gulf Coast fraudulently unbundled charges to Allstate for surgical procedures and DME.

i.   The defendants improperly manipulated the medical billing coding system in an intentional effort to induce Allstate to make payment on claims that were never compensable.

j.   Fountain View and Performance Orthopedics submitted fraudulent bills falsely representing that procedures were done separate and apart from one another by abusing CPT Code modifier 59.

k.   The defendants charged Allstate grossly unreasonable and uncustomary amounts for all of the treatment and services billed in furtherance of the scheme to obtain immediate profits by selling their accounts receivable for a percentage of the amount billed.

404.   As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

405.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary under Michigan law.

406.   The foregoing facts – billing for services not rendered, unlicensed and unlawful treatment and services, using a predetermined treatment protocol to inflate charges, misrepresenting the necessity of procedures allegedly performed, and using fraudulent billing practices such as unbundling – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

407.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing billed for by the defendants unnecessary and unlawful.

408.   The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 7.

409.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the

treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

410.   Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

411.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, screenings, testing, procedures, DME, and ancillary services for which they billed Allstate.

412.   As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

**B.   ALLSTATE'S JUSTIFIABLE RELIANCE**

413.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

414.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

415.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

416.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

417.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

418.   In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

419.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

420.   As a result, Allstate has paid in excess of $730,805 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XII.   **MAIL AND WIRE FRAUD RACKETEERING ACTIVITY**

421.   As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

422.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 7, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

423.   This objective necessarily required the submission of claims for payment to Allstate.

424.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

425.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the

insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

426. All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Iowa.

427. Allstate received all medical records and bills faxed to it by the defendants in Iowa.

428. Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, benefits payment checks, and the return of the cancelled check drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of check draft duplicates to Allstate for filing.

429. It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including payment of fraudulent bills via checks mailed by Allstate.

430. Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

431. The fraudulent medical billing scheme detailed herein generated hundreds of mailings and faxes.

432.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 11.

433.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via interstate wires or the U.S. Mail related to each exemplar patient discussed in this Complaint.

434.   It was within the ordinary course of business for ISpine, Fountain View, Northwest Neurology, Performance Orthopedics, BRR Medical, Gulf Coast, and CCT Medical to submit claims for No-Fault payments to insurance carriers like Allstate through interstate wires and the U.S. Mail.

435.   Moreover, the business of billing for medical services by each of the defendant entities at issue herein is regularly conducted by fraudulently seeking payment to which each defendant entity is not entitled through the use of fraudulent communications sent via faxes and the U.S. Mail.

436.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendant entities.

437.   The defendant entities, at the direction and with the knowledge of their owners and managers (the individual defendants), continue to submit claims for payment to Allstate and, in some instances, continue to litigate against Allstate seeking to collect on unpaid claims.

438.   Thus, the defendants' commission of mail and wire fraud continues.

439.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mail in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

440.   As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

441.   Allstate reasonably relied on the submissions it received from ISpine, Fountain View, Northwest Neurology, Performance Orthopedics, BRR Medical, Gulf Coast, and CCT Medical (by and through Pribil, Barber, Jenkins, and Swift), including the representative submissions set out in Exhibit 11 annexed hereto and identified in the exemplar claims above.

442.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII.  **DAMAGES**

443.   The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

444.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $730,805.

445.   Exhibits 12 through 18 annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

446.   Exhibits 12 (ISpine), 13 (Fountain View), 14 (Northwest Neurology), 15 (Performance Orthopedics), 16 (BRR Medical), 17 (Gulf Coast), and 18 (CCT Medical), annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

447.   Every claim and payment identified in Exhibits 12 through 18 derives from an Allstate insurance policy.

448.   Allstate's claim for compensatory damages, as set out in Exhibits 12 through 18, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

449.   Every payment identified in Exhibits 12 through 18 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 12 through 18.

450.   Moreover, every payment identified in Exhibits 12 through 18 derives from a check sent by Allstate to the defendants through the U.S. Mail.

451.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

452.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

453.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  **CAUSES OF ACTION**

### **COUNT I**
### **VIOLATIONS OF 18 U.S.C. § 1962(c)**
### **(ISpine Enterprise)**
### **Against Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc.; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O.**

454.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

455.   ISpine constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

456.   In connection with each of the claims identified in the within Complaint, Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc.; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O. ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by ISpine, or knew that such false medical documentation would be faxed and mailed in the ordinary course of ISpine's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by ISpine would occur, in furtherance of the Count I defendants' scheme to defraud.

457.    The Count I defendants employed, knew, or should have foreseen that, two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the charts annexed hereto at Exhibits 1 and 11.

458.    Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

459.    Policies of insurance were delivered to insureds through the U.S. Mail.

460.    Payments to ISpine from Allstate were transmitted through the U.S. Mail.

461.    As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by ISpine, which they knew would be billed by ISpine, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

462.    Pribil and Barber owned and managed ISpine and were responsible for all actions taken by ISpine and its employees and representatives.

463.    Fountain View, which is owned by Swift, provided ISpine with facilities to bill for medically unnecessary procedures.

464. Northwest Neurology and its owner Jenkins billed for unwarranted IONM that was used to falsely justify procedures billed by ISpine.

465. BRR Medical, Gulf Coast, and CCT Medical issued (if at all) DME to create the appearance that procedures and services billed by ISpine were medically necessary.

466. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to ISpine for the benefit of the Count I defendants that would not otherwise have been paid.

467. The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

468. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

469.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to ISpine for the benefit of the Count I defendants.

470.   The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

471.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

472.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

473.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

474.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

475.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATIONS OF 18 U.S.C. § 1962(d)
### (ISpine Enterprise)
**Against Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc.; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O.**

476.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

477.    Defendants Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc.; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O. ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of ISpine.

478.    The Count II defendants each agreed to further, facilitate, support, and operate the ISpine enterprise.

479.    As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

480.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of ISpine even though ISpine was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

481.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

482.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

483.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (Fountain View Enterprise)
**Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.**

484.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

485.   Fountain View constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

486. In connection with each of the claims identified in the within Complaint, ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O. ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Fountain View, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Fountain View's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Fountain View would occur, in furtherance of the Count III defendants' scheme to defraud.

487. The Count III defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the charts annexed hereto at Exhibits 2 and 11.

488. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

489. Policies of insurance were delivered to insureds through the U.S. Mail.

490. Payments to Fountain View from Allstate were transmitted through the U.S. Mail.

491.  As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Fountain View, which they knew would be billed by Fountain View, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

492.  Swift owned and managed Fountain View and was responsible for all actions taken by Fountain View and its representatives.

493.  ISpine, Performance Orthopedics, Pribil, Barber, and Swift billed for services and procedures at Fountain View that allowed Fountain View to submit charges to Allstate for medically unnecessary and unlawful facility fees and facility fees for procedures that did not happen at all.

494.  As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Fountain View for the benefit of the Count III defendants that would not otherwise have been paid.

495.  The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for

a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

496.   By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

497.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Fountain View for the benefit of the Count III defendants.

498.   The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

499.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

500.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

501.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

502.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

503.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## (Fountain View Enterprise)
### Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.

504.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

505.   Defendants ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil; Wesley Blake Barber; and Robert Swift ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Fountain View.

506.   The Count IV defendants each agreed to further, facilitate, support, and operate the Fountain View enterprise.

507.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

508.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Fountain View even though Fountain View was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

509.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

510.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

511.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**(Northwest Neurology Enterprise)**
**Against ISpine, PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Tessy Jenkins, M.D.**

512.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

513.   Northwest Neurology constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

514.   In connection with each of the claims identified in the within Complaint, ISpine, PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Tessy Jenkins, M.D. ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Northwest Neurology, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Northwest Neurology's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Northwest Neurology would occur, in furtherance of the Count V defendants' scheme to defraud.

515.   The Count V defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the charts annexed hereto at Exhibits 3 and 11.

516.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

517.   Policies of insurance were delivered to insureds through the U.S. Mail.

518.   Payments to Northwest Neurology from Allstate were transmitted through the U.S. Mail.

519.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Northwest Neurology, which they knew would be billed by Northwest Neurology, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

520.   Jenkins owned and managed Northwest Neurology and was responsible for all actions taken by Northwest Neurology and its representatives.

521.   ISpine, Pribil, and Barber arranged for Northwest Neurology to perform medically unnecessary IONM services on ISpine patients, which allowed Northwest Neurology to submit bills to Allstate.

522.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Northwest Neurology for the benefit of the Count V defendants that would not otherwise have been paid.

523.   The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for

a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

524.   By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

525.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Northwest Neurology for the benefit of the Count V defendants.

526.   The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

527.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

528.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

529.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

530.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

531.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**(Northwest Neurology Enterprise)**
**Against ISpine, PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Tessy Jenkins, M.D.**

532.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

533.   Defendants ISpine, PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Tessy Jenkins, M.D. ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Northwest Neurology.

534.   The Count VI defendants each agreed to further, facilitate, support, and operate the Northwest Neurology enterprise.

535.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

536.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Northwest Neurology even though Northwest Neurology was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

537.    The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

538.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

539.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (Performance Orthopedics Enterprise)
### Against Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; Wesley Blake Barber; and Robert Swift, D.O.

540.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

541.   Performance Orthopedics constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

542.   In connection with each of the claims identified in the within Complaint Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; Wesley Blake Barber; and Robert Swift, D.O. ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Performance Orthopedics, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Performance Orthopedics's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Performance Orthopedics would occur, in furtherance of the Count VII defendants' scheme to defraud.

543.   The Count VII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the charts annexed hereto at Exhibits 4 and 11.

544.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

545.   Policies of insurance were delivered to insureds through the U.S. Mail.

546.   Payments to Performance Orthopedics from Allstate were transmitted through the U.S. Mail.

547.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Performance Orthopedics, which they knew would be billed by Performance Orthopedics, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

548.   Swift is the owner and manager of Performance Orthopedics and is responsible for all actions taken by Performance Orthopedics and its representatives.

549.   Barber arranged for the sale of Performance Orthopedics accounts receivables to third-party medical factoring companies, which incentivized Performance Orthopedics to bill for unnecessary and extensive alleged services and allowed Performance Orthopedics to obtain funding to continue the scheme discussed herein.

550.   Fountain View provided Performance Orthopedics with facilities to bill for medically unnecessary procedures.

551.   BRR Medical and Gulf Coast issued DME prescribed by Performance Orthopedics, which was used by Performance Orthopedics to create the appearance of medical necessity for services billed.

552.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Performance Orthopedics for the benefit of the Count VII defendants that would not otherwise have been paid.

553.   The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

554.   By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

555.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Performance Orthopedics for the benefit of the Count VII defendants.

556.   The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

557.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

558.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

559.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

560.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

561.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
## VIOLATIONS OF 18 U.S.C. § 1962(d)
### (Performance Orthopedics Enterprise)
### Against Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; Wesley Blake Barber; and Robert Swift, D.O.

562.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

563.   Defendants Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; Wesley Blake Barber; and Robert Swift, D.O. ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Performance Orthopedics.

564.   The Count VIII defendants each agreed to further, facilitate, support, and operate the Performance Orthopedics enterprise.

565.   As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

566.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Performance Orthopedics even though Performance Orthopedics was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

567.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

568.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII defendants' unlawful conduct described herein.

569.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (BRR Medical Enterprise)
### Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.

570.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

571.   BRR Medical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

572.   In connection with each of the claims identified in the within Complaint ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.;

Wesley Blake Barber; and Robert Swift, D.O. ("Count IX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by BRR Medical, or knew that such false medical documentation would be faxed and mailed in the ordinary course of BRR Medical's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by BRR Medical would occur, in furtherance of the Count IX defendants' scheme to defraud.

573.    The Count IX defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the charts annexed hereto at Exhibits 5 and 11.

574.    Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

575.    Policies of insurance were delivered to insureds through the U.S. Mail.

576.    Payments to BRR Medical from Allstate were transmitted through the U.S. Mail.

577.    As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by BRR Medical, which they knew would be billed by BRR Medical, in order to collect

payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

578.   ISpine, Performance Orthopedics, Pribil, Barber, and Swift prescribed the medically unnecessary DME that was billed by BRR Medical.

579.   The Count IX defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted BRR Medical to continue providing unlawful and medically unnecessary treatment, if provided at all.

580.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to BRR Medical for the benefit of the Count IX defendants that would not otherwise have been paid.

581.   The Count IX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue their fraudulent scheme without detection.

582.   By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the

Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

583.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to BRR Medical for the benefit of the Count IX defendants.

584.    The Count IX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

585.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendants' fraudulent acts.

586.    The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

587.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

588.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

589.    By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
## VIOLATIONS OF 18 U.S.C. § 1962(d)
### (BRR Medical Enterprise)
**Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.**

590.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

591.   Defendants ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O. ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of BRR Medical.

592.   The Count X defendants each agreed to further, facilitate, support, and operate the BRR Medical enterprise.

593.   As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

594.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of BRR Medical even though BRR Medical was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

595.   The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to

Allstate of insurance claim and medical record documents containing material misrepresentations.

596.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X defendants' unlawful conduct described herein.

597.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT XI**</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**(Gulf Coast Enterprise)**
**Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.**

598.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

599.   Gulf Coast constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

600.   In connection with each of the claims identified in the within Complaint, ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O. ("Count XI defendants")

intentionally caused to be prepared, faxed, and mailed false medical documentation by Gulf Coast, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Gulf Coast's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Gulf Coast would occur, in furtherance of the Count XI defendants' scheme to defraud.

601. The Count XI defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the charts annexed hereto at Exhibits 6 and 11.

602. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

603. Policies of insurance were delivered to insureds through the U.S. Mail.

604. Payments to Gulf Coast from Allstate were transmitted through the U.S. Mail.

605. As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Gulf Coast, which they knew would be billed by Gulf Coast, in order to collect

payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

606.  ISpine, Performance Orthopedics, Pribil, Barber, and Swift prescribed the medically unnecessary DME that was billed by Gulf Coast.

607.  The Count XI defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Gulf Coast to continue providing unlawful and medically unnecessary treatment, if provided at all.

608.  As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Gulf Coast for the benefit of the Count XI defendants that would not otherwise have been paid.

609.  The Count XI defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI defendants to continue their fraudulent scheme without detection.

610.  By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the

Count XI defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

611.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Gulf Coast for the benefit of the Count XI defendants.

612.   The Count XI defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

613.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI defendants' fraudulent acts.

614.   The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

615.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

616.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

617.   By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
## VIOLATIONS OF 18 U.S.C. § 1962(d)
### (Gulf Coast Enterprise)
**Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.**

618.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

619.    Defendants ISpine, PLLC; Performance Orthopedics of Michigan PLLC; BRR Medical Supply, Inc; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O. ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Gulf Coast.

620.    The Count XII defendants each agreed to further, facilitate, support, and operate the Gulf Coast enterprise.

621.    As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

622.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Gulf Coast even though Gulf Coast was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

623.    The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

624.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XII defendants' unlawful conduct described herein.

625.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (CCT Medical Enterprise)
### Against ISpine, PLLC; Stefan Pribil, M.D.; and Wesley Blake Barber

626.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

627.   CCT Medical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

628.   In connection with each of the claims identified in the within Complaint, ISpine, PLLC; Stefan Pribil, M.D.; and Wesley Blake Barber ("Count XIII defendants") intentionally caused to be prepared, faxed, and mailed false

medical documentation by CCT Medical, or knew that such false medical documentation would be faxed and mailed in the ordinary course of CCT Medical's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by CCT Medical would occur, in furtherance of the Count XIII defendants' scheme to defraud.

629.   The Count XIII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the charts annexed hereto at Exhibits 7 and 11.

630.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

631.   Policies of insurance were delivered to insureds through the U.S. Mail.

632.   Payments to CCT Medical from Allstate were transmitted through the U.S. Mail.

633.   As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by CCT Medical, which they knew would be billed by CCT Medical, in order to collect

payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

634.   ISpine, Pribil, and Barber prescribed the medically unnecessary DME that was billed by CCT Medical.

635.   The Count XIII defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted CCT Medical to continue providing unlawful and medically unnecessary treatment, if provided at all.

636.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to CCT Medical for the benefit of the Count XIII defendants that would not otherwise have been paid.

637.   The Count XIII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII defendants to continue their fraudulent scheme without detection.

638.   By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the

Count XIII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

639. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to CCT Medical for the benefit of the Count XIII defendants.

640. The Count XIII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

641. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII defendants' fraudulent acts.

642. The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

643. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

644. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

645. By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### (CCT Medical Enterprise)
### Against ISpine, PLLC; Stefan Pribil, M.D.; and Wesley Blake Barber

646. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

647. Defendants ISpine, PLLC; Stefan Pribil, M.D.; and Wesley Blake Barber ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of CCT Medical.

648. The Count XIV defendants each agreed to further, facilitate, support, and operate the CCT Medical enterprise.

649. As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

650. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of CCT Medical even though CCT Medical was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

651. The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

652.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XIV defendants' unlawful conduct described herein.

653.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XV
### COMMON LAW FRAUD
### Against All Defendants

654.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

655.   The scheme to defraud perpetrated by ISpine, PLLC; Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; Performance Orthopedics of Michigan PLLC; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O. ("Count XV defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were lawfully and actually providing necessary services in

compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

656.   The misrepresentations of fact made by the Count XV defendants include, but are not limited to, those material misrepresentations discussed in section XI *supra*.

657.   The Count XV defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

658.   The misrepresentations were intentionally made by the Count XV defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

659.   The Count XV defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

660.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

661.  As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**COUNT XVI**
**CIVIL CONSPIRACY**
**Against All Defendants**

662.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

663.  Defendants ISpine, PLLC; Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; Performance Orthopedics of Michigan PLLC; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O. ("Count XVI defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to Allstate policies and applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

664.   The Count XVI defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

665.   This purpose was known to all of the Count XVI defendants and intentionally pursued.

666.   Despite knowing that the defendants were not entitled to payment pursuant to Allstate policies and applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices all in furtherance of their *quid pro quo* network and predetermined treatment protocol (as detailed throughout this Complaint), the Count XVI defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

667.   In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

668.   All of the Count XVI defendants directly benefited from the payments made to ISpine, Fountain View, Northwest Neurology, Performance Orthopedics, BRR Medical, Gulf Coast, and CCT Medical.

669.   All of the Count XVI defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XVI

defendants in the commission of acts done for the benefit of all Count XVI defendants and to the unjustified detriment of Allstate.

670.    Accordingly, all of the Count XVI defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

### COUNT XVII
**PAYMENT UNDER MISTAKE OF FACT**
**Against ISpine, PLLC; Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; Performance Orthopedics of Michigan PLLC; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; and CCT Medical Supplies, Inc.**

671.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

672.    Allstate paid the amounts described herein and itemized in Exhibits 12 through 18 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by ISpine, PLLC; Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; Performance Orthopedics of Michigan PLLC; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; and CCT Medical Supplies, Inc. ("Count XVII defendants").

673.    Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XVII defendants, which misrepresented the fact,

reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

674.   The Count XVII defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

675.   Allstate is entitled to restitution from each of the Count XVII defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

**COUNT XVIII**
**UNJUST ENRICHMENT**
**Against All Defendants**

676.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

677.   Allstate paid monies, including those amounts set out in Exhibits 12 through 18, in response to the claims submitted and caused to be submitted by defendants ISpine, PLLC; Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; Performance Orthopedics of Michigan PLLC; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O. ("Count XVIII defendants") in reasonable belief that it was

legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

678. Allstate's payments constitute a benefit which the Count XVIII defendants aggressively sought and voluntarily accepted.

679. The Count XVIII defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

680. The Count XVIII defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate.

681. The Count XVIII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

**COUNT XIX**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against All Defendants**

682. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 453 set forth above as if fully set forth herein.

683. Defendants ISpine, PLLC; Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; Performance Orthopedics of Michigan PLLC; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O. ("Count XIX defendants")

routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

684.   The Count XIX defendants also rendered services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

685.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.   Mich. Comp. Laws §§ 500.3105 and 500.3107.

686.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

687.   The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.

688.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

689.   The Count XIX defendants continue to submit claims under Allstate policies and applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

690.   The Count XIX defendants will continue to submit claims under Allstate policies and applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XIX defendants for any or all of the reasons set out in the within Complaint.

691.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants billed for unnecessary and unlawful treatment that is not compensable under Allstate policies and applicable provisions of the Michigan No-Fault Act.

692.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

693.   As such, the Count XIX defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring

that the Count XIX defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

694.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XV.   <u>DEMAND FOR RELIEF</u>

<u>COUNT I</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**(ISpine Enterprise)**
**Against Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc.; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O.**

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### (ISpine Enterprise)
**Against Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc.; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (Fountain View Enterprise)
**Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

### COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### (Fountain View Enterprise)
### Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

### COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (Northwest Neurology Enterprise)
### Against ISpine, PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Tessy Jenkins, M.D.

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### (Northwest Neurology Enterprise)
### Against ISpine, PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Tessy Jenkins, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (Performance Orthopedics Enterprise)
### Against Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; Wesley Blake Barber; and Robert Swift, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

138

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VIII
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**(Performance Orthopedics Enterprise)**
**Against Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; Wesley Blake Barber; and Robert Swift, D.O.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IX
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**(BRR Medical Enterprise)**
**Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### (BRR Medical Enterprise)
**Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (Gulf Coast Enterprise)
**Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

140

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**(Gulf Coast Enterprise)**
**Against ISpine, PLLC; Performance Orthopedics of Michigan PLLC; Stefan Pribil, M.D.; Wesley Blake Barber; and Robert Swift, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIII
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**(CCT Medical Enterprise)**
**Against ISpine, PLLC; Stefan Pribil, M.D.; and Wesley Blake Barber**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIV
## VIOLATIONS OF 18 U.S.C. § 1962(d)
### (CCT Medical Enterprise)
### Against ISpine, PLLC; Stefan Pribil, M.D.; and Wesley Blake Barber

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XV
## COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XVI
**CIVIL CONSPIRACY**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XVII
**PAYMENT UNDER MISTAKE OF FACT**
**Against ISpine, PLLC; Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; Performance Orthopedics of Michigan PLLC; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; and CCT Medical Supplies, Inc.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XVIII
**UNJUST ENRICHMENT**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XIX
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)     DECLARE that Allstate has no obligation to pay pending and previously denied No-Fault insurance claims submitted by ISpine, PLLC; Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; Performance Orthopedics of Michigan PLLC; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O. for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that ISpine, PLLC; Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; Performance Orthopedics of Michigan PLLC; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O., jointly and severally, cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that ISpine, PLLC; Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center; Northwest Neurology, P.C.; Performance

Orthopedics of Michigan PLLC; BRR Medical Supply, Inc.; Gulf Coast Medical Services, LLC; CCT Medical Supplies, Inc; Stefan Pribil, M.D.; Wesley Blake Barber; Tessy Jenkins, M.D.; and Robert Swift, D.O., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law, federal law, and the principles of equity.

## XVI.  **JURY DEMAND**

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____

Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
Andrew H. DeNinno
adeninno@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2303
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Property and Casualty*
*Insurance Company, Allstate Fire and*
*Casualty Insurance Company,*
*Esurance Insurance Company, and*
*Esurance Property and Casualty*
*Insurance Company*

Dated:  July 28, 2020