UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ALLSTATE INSURANCE COMPANY, ET AL.,**<br><br>Plaintiffs/Counter-Defendants,<br><br>vs.<br><br>**PERFORMANCE ORTHOPEDICS OF MICHIGAN PLLC ET AL.,**<br><br>Defendants/Counter-Plaintiffs. | 2:20-CV-12008-TGB-EAS<br>HON. TERRENCE G. BERG<br><br><br>**ORDER RESOLVING CROSS MOTIONS FOR SUMMARY JUDGMENT**<br>**(ECF NOS. 100, 101)** |

In this lawsuit, Allstate Insurance Company and several associated insurers have sued nearly a dozen doctors, medical supply companies, surgical centers, and other medical providers for unjust enrichment, common-law fraud, and for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act. All of the Defendants have settled or been dismissed except for Dr. Robert Swift and his company, Performance Orthopedics of Michigan.

Plaintiffs accuse Defendants Dr. Swift and Performance Orthopedics of attempting to bill them for services that were not performed or were medically unnecessary. These Defendants are also named as part of a larger corrupt scheme to defraud. Plaintiffs say that other providers double-billed them for services that Swift also claimed

1

to have performed. They further charge that Swift's role was a necessary component of schemes to bill Plaintiffs for unnecessary treatments performed and medical equipment issued by others, because he wrote the prescriptions that other entities filled.

The parties have filed cross motions for summary judgment.

## I.   BACKGROUND

There were originally 11 Defendants in this case. Four were surgical centers or providers of neurological testing or other services: ISpine PLLC; Surgical Center of Southfield, LLC (also known as "Fountain View Surgery Center"); Northwest Neurology, P.C.; and Performance Orthopedics of Michigan PLLC. Three were "durable medical equipment" suppliers: BRR Medical Supply, Inc.; Gulf Coast Medical Service, LLC; and CCT Medical Supplies, Inc. There were also four individual Defendants: Dr. Stefan Pribil; Dr. Tessy Jenkins; Wesley Barber; and the remaining individual Defendant, Dr. Robert Swift.

Though nearly all of the Defendants have been dismissed, some background on the suit will be helpful to understand the remaining claims against Swift and Performance.

Plaintiff Allstate[1] accused the Defendants of operating as RICO enterprises. According to Allstate, the Defendants operated as a "cooperative," made up of the Defendant entities and certain members of their medical and nonmedical staff. Allstate brought seven RICO counts and seven RICO conspiracy counts. Each count identified one of the seven entity Defendants as a RICO "enterprise," and named several other Defendants as participating in that enterprise.

Allstate accuses the cooperative of submitting bills for services that either were never performed or were not medically necessary. Allstate says that the surgeon Defendants submitted charges for procedures that never happened. ECF No. 1, PageID.22–27. Allstate also maintains that multiple Defendants routinely submitted bills for the same procedure, service, or piece of medical equipment. *Id.* at PageID.28–37. Allstate also claims that some of the medical supplier Defendants issued prescribed medical equipment without the required license. *Id.* at PageID.37.

All Defendants have now been dismissed save for Performance and Dr. Swift. Swift and Performance are accused of participating in the ISpine enterprise, the Fountain View/Surgical Center of Southfield

---

[1] Plaintiffs are five insurance companies under the Allstate umbrella. For simplicity, the Court will refer to the Plaintiffs as "Allstate" in the singular.

enterprise, the BRR enterprise, and the Gulf Coast enterprise. Swift is accused of participating in the Performance enterprise but, because of the way RICO claims must be pled to remain viable, Performance itself is not.

Robert Swift, D.O. is a Doctor of Osteopathy and the 100% owner of Performance Orthopedics of Michigan. Swift was also a part-owner and sat on the board of governors of the Surgical Center of Southfield, which operated under the name "Fountain View Surgery Center." Swift Dep., ECF No. 101-4, PageID.2586–88. As part of his operating agreement, Swift agreed to conduct at least 30% of his surgeries at the facility. *Id.* at PageID.2588.

Allstate accuses Swift of referring patients to ISpine for unnecessary evaluation and treatment. It also accuses him of scheduling and conducting unnecessary surgical procedures at Fountain View. It further accuses him of writing prescriptions for unnecessary "durable medical equipment" that were filled by BRR and Gulf Coast.

Allstate also accuses Swift, Fountain View, Performance—and the other entities that allegedly submitted bills—of fraudulent billing practices. ECF No. 1, PageID.64. Allstate says that Swift and Performance deviated from commonly accepted medical billing practices and committed fraud by "unbundling" medical services in their bills. *Id.* at PageID.65. "Unbundling" is the practice of billing separately for

individual components of a procedure or pieces of equipment when those components or equipment are already integrated into the billing code for the procedure itself—a code that is also billed.[2] *Id.*

For example, Allstate says that Defendants billed for the act of "spinal exploration" while also billing for a comprehensive surgical procedure that would necessarily involve a spinal exploration. *Id.* According to Allstate, Defendants billed for supplies and ordinary equipment used during procedures while also billing for the procedures themselves. *Id.* at PageID.66. Allstate also says that all of the bills Defendants submitted dramatically inflated the costs of the procedures billed. *Id.* at PageID.71. Allstate maintains this was the case whether the procedures were necessary and actually performed, unnecessary and actually performed, or never performed at all.

Throughout the relevant period, Swift's billing was done by third-party medical billing companies. These experts reviewed Swift's notes from the procedures he performed and, nominally, were supposed to translate the surgery notices into billing codes and send those codes in

---

[2] At issue in this case is the use of "Current Procedural Terminology" codes or "CPT codes." This is a comprehensive catalogue of all items, procedures, and services that a doctor might perform. CPT codes, which are promulgated by the American Medical Association ("AMA"), are a kind of universal shorthand that allow doctors, insurers, and others to refer to medical procedures in a standardized way.

bills to Allstate. Kayal Dep., ECF No. 101-12, PageID.2937. But according to two of the billers, Swift exercised significant control over what billing codes were ultimately submitted—much more than other doctors. *Id*. Indeed, the relationship between Swift and one of the billers broke down because of Swift's insistence that the billers submit the codes Swift had selected. Jones Dep., ECF No. 101-13, PageID.3018–20.

In support of its motion, Allstate has submitted three expert reports. The first and second are by Doctors Robert Waltrip and James Cosgrove, respectively. *See* Waltrip Report, ECF No. 101-5; Cosgrove Report, ECF No. 101-6. Doctor Waltrip concluded, among other things, that "a majority" of the procedures for which Swift and Performance billed Allstate actually treated conditions unrelated to an auto accident. ECF No. 101-5, PageID.2628. Waltrip further found that billing records "frequently include billing codes for surgical procedures that were not actually performed according to the operative record." *Id*. at PageID.2629. Doctor Cosgrove reached similar conclusions.

The third report was by Tamera Rockholt, a nurse with expertise in medical billing. Rockholt reviewed 39 patients' bills submitted by Performance for services rendered by Swift and a medical assistant. Rockholt identified numerous instances in which Swift and Performance "upcoded" bills by using a billing code that corresponded to a more complex evaluation than the evaluation reflected in the visit

6

notes. Rockholt Report, ECF No. 101-7, PageID.2829. And of the 14 surgical procedures she reviewed, Rockholt identified nine instances of unbundled billing and nine instances in which Performance used an unsupported code, meaning the provider's documentation was not consistent with the code's description. *Id.* at PageID.2827, 2829.

Defendants offered no competing expert report in response. However, Swift filed a supplemental declaration explaining his belief that, for each of the patients for whom Allstate actually paid bills, all treatment rendered was medically necessary and reasonable, and that the bills were "accurate descriptions of the services/procedures performed." Swift Supp. Decl., ECF No. 104-2, PageID.3364. Swift offers the same opinion about the bills for other patients that Allstate did not pay. *Id.* at PageID.3365. Allstate objects to this declaration, as will be discussed below.

## II.    ANALYSIS

### A. Allstate's objection to Swift's supplemental declaration

Before reaching the merits of both sides' respective motions, the Court must address Allstate's objection to supplemental declaration filed by Defendant Swift. ECF No. 106. Allstate maintains that Swift's declaration is a disguised expert report. It argues that, because Swift was never identified as an expert witness, he may not offer expert testimony.

A party may object to the material supporting a motion for summary judgment on the basis that the facts it purports to contain cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). Allstate says that Swift's expert opinion is inadmissible under Fed. R. Civ. P. 37(c)(1). That rule allows a court to exclude the testimony of a witness who was not disclosed as required by Rule 26.

The most recent scheduling order in this case, entered in December 2021, called for the exchange of expert reports by April 29, 2022, and the completion of all expert depositions by June 30, 2022. Stip. ECF No. 91, PageID.2127. Allstate submitted a witness list from the Defendants dated September 10, 2021. *See* Witness List, ECF No. 101-19. That list identifies Swift as a witness, but not as an expert. *Id.* at PageID.3196. It also indicates that Defendants may call "[e]xpert witnesses to be named in accordance with [the] court['s] scheduling order." *Id.*

Defendants do not dispute that they neither identified any expert witnesses nor disclosed an expert report from Swift. Rather, they appear to argue that no specific expert disclosure of Swift's opinions was required.

Rule 26(a)(2) governs the mandatory disclosure of expert witnesses. The rule contemplates two categories of experts: those who must provide a written report, and those who need not. A witness who

8

is "retained or specially employed to provide expert testimony in the case" must provide an expert report. Fed. R. Civ. P. 26(a)(2)(B). So too must a witness "whose duties as the party's employee regularly involve giving expert testimony." *Id.* That written report must contain a complete statement of all opinions the witness will offer and the basis for them, the facts considered in forming them, any exhibits that will be used to support or summarize them, the witness's qualifications, a list of all other cases in which the witness has offered expert testimony in the last four years, and a statement of compensation. Fed. R. Civ. P. 26(a)(2)(B)(i–vi).

A witness who is not specifically retained to offer expert testimony or whose duties do not regularly involve giving expert testimony need not provide such a report. Fed. R. Civ. P. 26(a)(2)(C). But a party must still provide a disclosure even for witnesses who need not provide a written report. That disclosure must state "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C)(i–ii).

Defendants have at least a colorable argument that Swift did not qualify as the sort of witness who would need to provide a written

report.[3] Indeed, they devote virtually their entire response to this point.[4] But, as Allstate points out, Defendants ignore the central requirement of Rule 26(a)(2)(C): even if Swift was not required to produce a written report, Defendants were still obliged to identify him as an expert witness if they wished to present his opinion testimony and provide a summary of facts and opinions to which he was expected to testify. They did not do so.[5]

The question, then, is what remedy is appropriate for Defendants'

---

[3] Allstate contends that Swift's duties regularly involve giving expert testimony, and that Swift was therefore required to provide a full written report. The Court does not decide into which category of Rule 26(a)(2) Swift falls. Nevertheless, the general rule in the Sixth Circuit appears to be that a treating physician need not provide a written report, so long as the testimony does not stray beyond the physician's own treatment and diagnosis of the patient. *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 870-71 (6th Cir. 2007); *Avendt v. Covidien Inc.*, No. 11-15538, 2014 WL 7338727, at *4 (E.D. Mich. Dec. 20, 2014) (collecting cases).

[4] Defendants also argue that Allstate deposed Swift fully once and was afforded the opportunity to depose Swift a second time as well, but elected not to. This is immaterial. Without advance knowledge that Swift planned to testify as an expert and a summary of his testimony, a second deposition focused on his yet-unknown expert testimony would have been of limited value.

[5] "The application of the Rule 26 disclosure requirements depends on the substance of the treating physician's testimony rather than his or her status." *Hawkins v. Graceland*, 210 F.R.D. 210, 211 (W.D. Tenn. 2002) (collecting cases).

failure to identify Swift as an expert witness. Allstate argues that Swift should be entirely precluded from testifying, either at trial or in support of a motion for summary judgment. Both sides agree that this would be tantamount to entering default judgment in favor of Plaintiffs and against the Defendants. Because many of the claims and defenses in this suit rise and fall on a difference of medical opinion, without a competing expert's testimony Defendants can point to no dispute of material fact. Defendants say that this sanction would be far too harsh.

Discovery sanctions are governed by Rule 37, which affords a court broad discretion in fashioning a sanction for failure to disclose a witness as required by Rule 26. The court may prohibit the witness from testifying or supplying evidence unless the failure was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Sixth Circuit weighs five factors when determining whether the violating party has met its burden to show that the nondisclosure was substantially justified or is harmless: (1) surprise to the party against whom the evidence would be offered; (2) ability of that party to cure the surprise; (3) extent to which allowing the evidence would disrupt the trial; (4) importance of the evidence; and (5) nondisclosing party's explanation for its failure to disclose the evidence. *Wade v. United States,* No. 21-10552, 2022 WL 19001837, at *2 (E.D. Mich. Dec. 19, 2022) (citing *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015)).

Or, "in addition to or instead of" that sanction, the court may "on

motion and after giving an opportunity to be heard" order the payment of reasonable expenses caused by the failure, inform the jury of the party's failure, or impose other appropriate sanctions. Fed. R. Civ. P. 37(c)(1).

In support of its argument that Swift should be precluded from testifying at all, Allstate points to *Executive Ambulatory Surgical Center, LLC v. Allstate Fire & Casualty Insurance Co.*, 623 F. Supp. 3d 826 (E.D. Mich. 2022). There, Magistrate Judge Ivy determined that two physician expert witnesses were not required to produce full written reports, but should have been disclosed under Rule 26(a)(2)(C), and ordered the plaintiff to file an updated witness list reflecting the proper role of the witnesses.

But contrary to Allstate's description of that case, Judge Ivy did not bar the physician-owner of a surgical center from testifying because a disclosure was not made under Rule 26. Instead, Judge Ivy prohibited his testimony because, although the witness was competent to testify about the treatments he performed, he was not qualified as an expert on the whether the rates he charged were reasonable in light of the prevailing rate in the geographic area. *Id.* at 834.

Here, in the supplemental declaration, Swift offers his opinion concerning the validity of billing codes that he used. This kind of testimony veers over the line of mere factual observations and creeps into opinions or even legal conclusions reached from specialized

knowledge. At the same time, as a physician, Swift occupies a hybrid position as a highly educated, medically trained professional, but also a lay witness who has personal work experience in applying the CPT codes.[6] It is not clear whether specialized knowledge of CPT codes is too remote from observations during surgery and other procedures that would not require disclosure as an expert. In some respects, Swift's testimony regarding how he applied the CPT codes may more appropriately be treated as the opinion of a lay witness under Fed. R. Evid. 701—it is based rationally on his perception; it will be helpful in providing a better understanding of his testimony and determining the facts, and it arguably is not based on the kind of scientific, technical, or specialized knowledge covered by Rule 702 (that is, based on "sufficient facts or data" and "the product of reliable principles and methods" that are reliably applied).  *See* Fed. R. Evid. 701, 702. If Swift's testimony regarding his coding practices is lay opinion testimony, Defendants would not have been required to disclose him as an expert under Rule 26(a)(2).

---

[6] "Treating physicians … can testify as ordinary witnesses without disclosure as experts if the essence of the testimony is factual. Thus, even though Dr. Feck has specialized knowledge, to the extent that Dr. Feck is testifying as an ordinary witness, disclosure as an expert was unnecessary." *Oaks v. Wiley Sanders Truck Lines*, No. 07-45, 2008 U.S. WL 11344846, at *2 (E.D. Ky. Oct. 29, 2008).

And the Court also notes that Allstate deposed Swift on these very subjects: his experience with billing CPT codes generally, how he would apply them in certain hypothetical procedures, and why he applied them to specific patients. *See* Swift Dep., ECF No. 101-4, PageID.2444–55, 2534–60, 2597–98, 2602–09. Counsel did not explicitly state during the deposition whether they were treating Swift as an ordinary lay witness or as a full expert who had properly disclosed the topics to which they would testify.

Ultimately, prohibiting Swift from testifying—a fact witness with direct knowledge of all the relevant claims and a party with a due process right to defend himself—is too harsh a sanction. It would be tantamount to entering default judgment in favor of Allstate. Allstate has not been irreparably prejudiced by Defendants' failure to disclose; no trial date has yet been set.  *See, e.g.*, *Heartland Rehab. Servs. v. Mekjian*, No. 06-11769, 2007 WL 1266352, at *1 (E.D. Mich. May 1, 2007). It is not clear why Defendants failed to disclose Swift timely as an expert but the record suggests it may simply have been an oversight. Allstate presents no evidence showing it was in bad faith. *See Howe*, 801 F.3d at 749 (finding that "Plaintiffs' late disclosure was more likely the result of negligence, confusion, and lack of information than underhanded gamesmanship"). Whatever minor prejudice Allstate suffers due to Defendants' delay in identifying Swift's opinion testimony, it may be readily cured by only considering Swift's

testimony—both from his deposition on the record and supplemental declaration—as that of a lay witness for purposes of these cross-motions for summary judgment.

Therefore, Allstate's motion to strike this declaration will be granted in part and denied in part. Defendants will not be permitted to present any expert witnesses at trial, but Swift may testify as a treating physician regarding his observations and knowledge and may offer lay witness opinion testimony. If there are specific areas of testimony in the supplemental declaration that Allstate believes are inadmissible, Allstate may file a motion in limine seeking to exclude such statements, and may then address what it believes is the permissible scope of Swift's testimony.

In proceeding, parties should be mindful of the fact that these claims will likely turn on a dispute of medical necessity and reasonableness that, in all likelihood, will require resolution by a jury.

## B. Defendants' motion for summary judgment

Defendants move for summary judgment on Allstate's RICO claims. To make out its civil RICO claims, Allstate must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (citing S*edima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985)). Defendants challenge three of these elements. They say that the

enterprises named in the complaint are not proper RICO enterprises. They contend that the Defendants did not conduct any of the enterprises' affairs, even if these enterprises are proper. Finally, they say that Allstate cannot meet the "racketeering activity" element, because Swift lacked the requisite intent to commit wire or mail fraud.

### 1.   Whether Allstate has properly named an "enterprise" in each RICO count

Defendants argue that a RICO enterprise cannot consist of merely the named Defendants. ECF No. 100, PageID.2241. They argue that a "RICO enterprise alleged as an association-in-fact must be pled as existing separately from the Defendants' activity." *Id.*

As Allstate points out, all of the cases Defendants cite in their Response deal with "association-in-fact" RICO enterprises. An association-in-fact enterprise is a group associated for the common purpose of engaging in certain conduct rather than a distinct legal entity. *Boyle v. United States*, 556 U.S. 938, 944, (2009). To establish the existence of an association-in-fact, a plaintiff must show certain elements. But a plaintiff need not allege these elements of an association-in-fact enterprise when the alleged RICO enterprise is itself a distinct legal entity—such as a corporation. *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 490 (6th Cir. 2013)

The enterprises alleged in the Complaint are not association-in-fact enterprises. Each count names a distinct legal entity: Counts I and

II pertain to ISpine; Counts III and IV to Fountain View; Counts VII and VIII to Performance;[7] Counts IX and X to BRR; and Counts XI and XII to Gulf Coast. Because all five are corporations, limited liability companies, or other identifiable legal entities, Allstate need not resort to an association-in-fact theory.

Defendants also argue that a RICO enterprise cannot consist only of the named Defendants. *See* ECF No. 100, PageID.2241 (citing *Durant v. ServiceMaster Co.*, 159 F.Supp.2d. 977, 981–82 (E.D. Mich. 2001). This appears to implicate RICO's "distinctness" requirement: if the alleged RICO enterprise is a corporation or other entity, the "person" against whom the RICO claim is asserted must be separate from the corporation or other entity that satisfies RICO's "enterprise" element.

The rule of *Durant* and the cases it rests upon is that a plaintiff may not sue a deep-pocketed corporation as a RICO defendant (the RICO "person") while simultaneously alleging that the corporation or the corporation collectively with its employees is *itself* the entity that satisfies RICO "enterprise" element. *See, e.g.*, *Compound Prop. Mgmt. v. Build Realty, Inc.*, 462 F. Supp. 3d 839, 856 (S.D. Ohio 2020).

That was the issue in *Durant*; a plaintiff sued three corporations in a single count, naming each corporation individually as a RICO

---

[7] Swift is named as a Defendant in the Performance enterprise counts (Counts VII and VIII), but Performance itself is not.

17

defendant or "person." *Durant*, 159 F. Supp. 2d at 981. The plaintiff further alleged that, collectively, all three corporations were a RICO "enterprise." As the *Durant* court explained, the same entity cannot be both the "person" and the "enterprise." *Id.* That is the issue discussed in *Durant* and its cited cases. *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir. 1996) (naming three corporations collectively as an enterprise and one corporation as a defendant is not permissible) (vacated on other grounds, 525 U.S. 128 (1998)); *Manhattan Telecomm. Corp. v. DialAmerica Mktg.*, 156 F. Supp. 2d 376, 381 (S.D.N.Y. 2001).

The facts at hand are not analogous to *Durant*, *NYNEX*, or *DialAmerica*. Allstate has not sued a corporation as a RICO defendant while also naming it and its employees collectively as the RICO "enterprise." In each count, Allstate names one of the companies alleged to have participated in this scheme as the "enterprise," and names the other entities and individuals as Defendants. In each count, the corporation forming the "enterprise" is not itself named as a Defendant, so the concerns in *Durant* do not apply.

Swift may also argue that he is not sufficiently distinct from the Performance or Fountain View enterprises because he was an owner or part-owner of those entities. But the Sixth Circuit and Supreme Court have rejected that argument, explaining that the owner of a corporation who conducts the affairs of her corporation in a RICO-forbidden way is

sufficiently distinct from the corporation itself. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).

> **2.   Whether there is a genuine dispute of fact whether Swift and Performance conducted the affairs of the enterprises at issue**

Defendants contend that Allstate has shown no evidence that Swift or Performance operated or managed the affairs of any of the other Defendants as part of a hierarchical structure, as required to establish RICO liability. Defendants point to the test set out in *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). There, the Supreme Court held that a person must participate in the "operation or management" of the enterprise to be held liable under RICO.

But RICO liability extends beyond those with "primary responsibility" for the enterprise's affairs; only "some part" in directing those affairs is required. *Ouwinga v. Benistar 419 Plan Servs.*, 694 F.3d 783, 792 (6th Cir. 2012). RICO liability is not limited to decision-makers; a person may "conduct" the affairs of a RICO enterprise by knowingly carrying out the enterprise's orders or by "continued endorsement of a fraudulent scheme." *Id.*

First, there can be no serious dispute that Swift "conducted" the affairs of Performance, as he was its sole owner and manager. *See* ECF No. 101-4, PageID.2390. Swift avers that he had nothing to do with the billing practices of Fountain View, ISpine, or the durable medical equipment companies (BRR and Gulf Coast). As Allstate points out,

19

courts elsewhere in this district have allowed RICO claims to proceed against doctors in similar circumstances.

In *State Farm Mutual Automobile Insurance Co. v. Physiomatrix, Inc.,* No. 12-11500, 2013 WL 509284, at \*5 (E.D. Mich. Feb. 12, 2013), Judge O'Meara held that an insurer's RICO claim could proceed against a doctor who allegedly prescribed unnecessary physical therapy treatments that were rendered by a third-party clinic. The Court explained that the doctor had helped conduct the clinic enterprise because his role was essential to the fraudulent scheme; Michigan law requires a doctor's prescription before physical therapy services are rendered.

In *State Farm Mutual Automobile Insurance Co. v. Pointe Physical Therapy, LLC*, Judge Borman held that a prescribing physician could be liable for "conducting" a RICO enterprise premised on rendering unnecessary treatment. 107 F. Supp. 3d 772, 786–87 (E.D. Mich. 2015). This was because the physicians were a necessary component of the scheme: "without the Prescribing Clinics engaging the Prescribing Physicians to write the orders for the medically unnecessary services, ultimately provided by the Treatment Facilities who could not provide the services without orders from the Prescribing Clinics and Physicians, … the goals of the enterprise could not be achieved." *Id.* at 786.

20

However, Swift's connection to ISpine and the DME suppliers appears too attenuated to support a conclusion that Swift or Performance "conducted" or conspired with those enterprises. Swift avers that he was casually acquainted with Dr. Stefan Pribil, ISpine's owner, having met him at Fountain View. Swift Decl., ECF No. 100-3, PageID.2266. He says that he never had any financial arrangement for referrals with ISpine or Dr. Pribil, and received only a "small number" of referrals. Wesley Barber, ISpine's administrator, testified that Dr. Pribil did not instruct ISpine staff to refer patients exclusively to Swift. Barber Dep., ECF No. 103-3, PageID.3296. Allstate does not point to any testimony suggesting an agreement or other relationship between Swift and ISpine, nor does Allstate identify patients who were referred to ISpine by Swift.

So too with the DME suppliers. Swift denied any financial relationship with BRR, Gulf Coast, or CCT. Swift Decl., ECF No. 100-3, PageID.2266–68. In response, Allstate supplies five prescriptions for durable medical equipment, four of which bear BRR letterhead. *See* ECF Nos. 103-4, 103-5. Allstate also points to the testimony of Candice Kayal, one of Swift's billers, and argues that she testified that Swift purchased certain equipment from CCT. However, that testimony is somewhat ambiguous upon a close review. *See* Kayal Dep., ECF No. 101-12, PageID.2952. It is not clear if Kayal understood "CCT" to be the

name of the supplier, or of the devices themselves, given her testimony that she was "unaware" of where Swift purchased the devices. *Id.*

All of this is a far cry from the kinds of involvement that has been held sufficient to show that a medical provider "conducted" the affairs of an alleged RICO enterprise. In *Pointe Physical Therapy*, 107 F. Supp. 3d at 780, a central management group owned and controlled "prescribing clinics" and "treatment facilities." Those clinics hired doctors who prescribed unneeded physical therapy according to a "predetermined protocol that had no relation to the individual patient's needs or diagnoses." *Id.* That treatment was to be obtained universally at the treatment facilities.

In *Physiomatrix*, the defendant doctor prescribed unnecessary physical therapy to be performed at the same defendant physical therapy clinics each time. 2013 WL 509284 at *5. And in *Allstate Ins. Co. v. Inscribed PLLC*, No. 19-13721, 2020 WL 5801186, at *2 (E.D. Mich. Sept. 29, 2020), the defendant physicians "required" their patients to fill prescriptions at the defendant pharmacy, and "arranged to have these unnecessary prescriptions filled" by the pharmacy in a quid-pro-quo agreement.

Swift's participation in the loose and sporadic practice of referrals that he and Barber described does not amount to the sort of systematic, tightly knit conduct of a RICO enterprise found in those cases. And Allstate has offered no testimony or evidence about a closer relationship

22

than that. Allstate has not shown that Swift referred patients exclusively to ISpine for the sort of services ISpine provided. Nor has Allstate showed that, whenever Swift wrote prescriptions for durable medical equipment, he required that they be filled by one of the DME suppliers named here.

But the facts showing a connection to Fountain View are far more substantial. Swift was a partial owner of Fountain View and a member of its board of governors. He had an express agreement with Fountain View that he and Performance would use Fountain View's facilities to conduct at least 30% of his surgeries. And the surgery center could not have submitted its allegedly fraudulent bills without Swift agreeing to perform surgeries at its facilities. That is enough to allow a reasonable juror to conclude that Swift conducted the affairs of the Fountain View enterprise.

For these reasons, judgment will be entered in the Defendants' favor on the RICO claims against Swift and Performance premised on the ISpine, BRR, and Gulf Coast enterprises (Counts I, II, IX, X, XI, and XII), but not on the counts related to the Fountain View or Performance enterprises.

### 3. Whether there is a genuine dispute of fact that the enterprises engaged in racketeering activity

23

Defendants also argue that Allstate must prove that Swift and Performance had the specific intent to commit wire fraud to satisfy RICO's racketeering activity requirement.

To make out its RICO claims, Allstate must show that the enterprise engaged in a "course of racketeering activity": two or more predicate acts within a ten-year period. *Moon*, 465 F.3d at 723. Mail and wire fraud, indictable under 18 U.S.C. § 1341 and 1343, respectively, qualify as predicate acts. *Id.* Mail fraud has two elements: (1) a scheme to defraud; and (2) use of the mails to further that scheme. *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012). The elements of wire fraud are the same, except the defendant must use the wires, not the mail, to further the scheme. *Id.* Only the first element, intent, is in dispute.

To make out the intent element, Allstate must show a plan or course of action by which the Defendants used false, deceptive, or fraudulent pretenses, representations, or promises to deprive Allstate of money. *Id.* Allstate must also show that the Defendants acted either with specific intent to defraud, or "with recklessness with respect to potentially misleading information." *Id.* (citing *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)). Intent to defraud may be established by circumstantial evidence, or by inferences "drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and

24

comprehension." *United States v. Rayborn*, 495 F.3d 328, 338 (6th Cir. 2007) (internal quotation marks omitted).

Allstate has offered ample evidence that the scheme was reasonably calculated to deceive it. Allstate's medical experts report that billing records from Swift and other alleged members of the enterprise include inappropriately selected billing codes, including those that reflect procedures that were never performed. The records also show that multiple bills were sometimes submitted for same service. Finally, the bills show—or at least, a reasonable juror who believed Allstate's experts' testimony could conclude that they show—a repeated pattern of prescribing medically unnecessary treatments and that all of this was reasonably calculated to deceive Allstate.

### 4.   Whether the voluntary payment doctrine bars any of Allstate's claims

Finally, Defendants argue that they cannot be liable to Allstate at all because of "the doctrine of voluntary payment." They argue that when an insurer receives a claim arising under Michigan's no-fault insurance law, the insurer is obliged to investigate the reasonableness and necessity of the claim before paying. They say that Allstate was fully apprised of the facts of each claimant, and was entitled to—and often did—conduct its own investigation before paying on the claim.

Allstate responds that very nature of fraud is to misleadingly induce a person to hand over money to which the fraudster is not

entitled. Allstate also argues that there is a dispute of fact whether or not it knew that the claims submitted were fraudulent. In response, Swift and Performance acknowledge that fraud can vitiate a defense of voluntary payment. But they employ circular logic by arguing that, because Allstate voluntarily paid the claims, there is no evidence of fraud.

Allstate has the better of the argument. In Michigan, a payment is only voluntary when made with full knowledge of the circumstances and without "artifice, fraud, or deception." *Pingree v. Mut. Gas Co.*, 107 Mich. 156, 158 (1895). A payment is not voluntary if it is induced by fraud. And a reasonable jury could conclude that one or more of the payments Allstate made to Swift and Performance were induced by fraud, and that Allstate was unaware of the bills' fraudulent nature. *See, e.g.*, *Durant v. ServiceMaster Co.*, 159 F. Supp. 2d 977, 981 (E.D. Mich. 2001) (noting that the voluntary payment doctrine does not apply when payment is predicated on mistake of fact). For those reasons, the voluntary payment doctrine does not preclude Allstate's RICO claims.

### C. Allstate's Motion for Summary Judgment

In its own motion, Allstate moves for summary judgment in its favor on Defendants' counterclaim. It also moves for judgment in its favor on its own claims for unjust enrichment, common law fraud, civil conspiracy, and declaratory judgment. Allstate further moves for summary judgment against Swift on its own RICO claims in Counts III,

26

IV, VII, and VIII, and against both Swift and Performance on its RICO claims in Counts III and IV only.[8]

### 1. Whether Allstate is entitled to summary judgment on its own RICO claims or fraud-based claims

Both sides agree that intent to defraud is a necessary element of Allstate's civil conspiracy, common law fraud, and RICO claims. Defendants argue that it would be inappropriate to find that they intended to defraud Allstate as a matter of law, correctly pointing out that in the ordinary case, the "question of intent to defraud is a question of fact for the jury." *Steele v. Great Am. Ins. Co.*, 850 F.2d 692 (6th Cir. 1988) (unpublished table decision).

Allstate replies that this is the rare case where the evidence of fraud is so strong that no reasonable juror could conclude that Defendants lacked the intent to defraud. They say that Defendants were clearly advised that their billing practices were improper, but continued to submit bills using those deceptive practices nonetheless.

After careful review of the testimony of the billing experts deposed in this case, the Court concludes that there is a genuine issue of material fact regarding Defendants' intent as to which reasonable

---

[8] Counts III and IV involve the "Fountain View Enterprise," while Counts VII and VIII involve the "Performance Orthopedics Enterprise." Allstate does not move for summary judgment in its favor on the counts involving the ISpine enterprise (Counts I and II) or durable medical equipment supplier enterprises (Counts IX–XII).

jurors could differ.  To be sure, the testimony of Allstate's billing expert Tamera Rockholt would likely be considered persuasive. *See generally*, ECF No. 101-7. A jury could easily accept Ms. Rockholt's conclusion that Defendants intentionally misused the billing codes and did so intending to defraud Allstate. But the question this motion asks is whether that conclusion is the *only* possible one that a reasonable juror could reach.

Dr. Swift insisted that there is an element of subjectivity to surgery coding: "[t]here's no … two plus two equals four. It's variable based on what you do, how much work you do and how it's interpreted and how it's fixed." Swift Dep., ECF No. 101-4, PageID.2452. He also chalked up some of the instances of double billing identified by Allstate to billing mistakes. *Id.* at PageID. 2605, 2612–13. Similarly, Swift explained that he sometimes billed two instances of the same procedure for a single surgical session because of the complexity of the particular surgery. For example, he testified to his view and the view of some "billers and coders" that surgical procedures involving two "lateral portals" instead of one should actually be billed as two separate procedures. *Id.* at PageID.2603–04.

This testimony is supported by that of Candice Kayal, one of Swift and Performance's former billers. Kayal repeatedly insisted that it was not her testimony that Dr. Swift "forcefully intended" her to submit the wrong billing codes. Kayal Dep., ECF No. 101-12, PageID.2940. Rather, Kayal testified that Swift "believes he's always right." *Id.* She

28

characterized the American Medical Association's guidelines on bundling as "suggestions." *Id.* at PageID.2942. She repeatedly testified that "surgery billing is very finicky." *Id.* at PageID.2948. She explained that there is an element of subjectivity to surgery coding: in some circumstances codes "are left up for interpretation because so much goes on within a surgery." *Id.* at PageID.2994.

Kayal further testified that the CPT guideline books created by the AMA are "guidelines." *Id.* at PageID.2976. A doctor contracted with Medicare or a traditional health insurer signs a "provider participating contract" agreeing to "take those guidelines as gospel." *Id.* But because doctors have no contracts with auto insurance carriers, strict adherence to CPT guidelines is "technically … kind of gray." *Id.* at PageID.2977. Kayal explained her view that doctors who submit bills to auto insurers—like Dr. Swift—are not required to use CPT codes at all.  As Ms. Kayal explained, the CMS rules and CPT codes "don't apply as 100 percent gospel" in the no-fault auto insurance context, though doctors "still like to use them as a guideline." *Id.* at PageID.2985. Kayal characterized the bundling rules as "voluntary." *Id.* at PageID.2990.

Allstate responds that once Swift *chose* to use CPT codes to submit his bills, he was obligated to conform to the CMS and AMA guidelines

that govern those codes.[9] Clearly, he did not do so. Indeed, Swift admits that he did not adhere strictly to the guidelines that govern the use of CPT codes. *See* Swift Dep., ECF No. 101-4, PageID.2445–46. He explained that he used CPT codes in his no-fault bills to maintain consistency with bills he submitted to health insurance companies, but that he expected Allstate to interpret the bill and surgical notes for itself notwithstanding the CPT codes Swift supplied. *Id.* at PageID.2446–49.

A jury could well conclude that in so doing, Swift intentionally defrauded Allstate. But given the countervailing evidence, a reasonable juror could also conclude that Swift's erroneous use of the CPT codes may not have been because of an intentional effort to defraud. A juror could conclude that Swift's billing practices were the product of a genuine but mistaken interpretation of the CPT codes, a good-faith

---

[9] Allstate also suggests that CPT-code billing *is* required in the no-fault context. For that proposition Allstate cites 45 C.F.R. § 162.1000(a), which provides that a "covered entity" must use CPT codes when "conducting a transaction covered by" 45 C.F.R. Part 162. But Allstate does not explain why Performance or Swift are "covered entities" or whether the no-fault transactions at issue were "covered" by Part 162. Allstate also points to a recent decision of the Michigan Court of Appeals, *Mich. Ambulatory Surgical Ctr. v. Liberty Mut. Ins. Co.*, No. 356082, 2022 WL 2188480, at *1 (Mich. Ct. App. June 16, 2022). But while Allstate is correct that the Court of Appeals confirmed that CPT codes are relevant in the no-fault context, nothing in that opinion appears to require their use.

dispute about their applicability to the surgeries at issue, an honest mistake, or purely reckless billing practices.

Though a jury could certainly conclude that Swift intended to defraud Allstate, they could also reject that interpretation of the facts. Accordingly, Allstate is not entitled to summary judgment on its fraud-based claims.

### 2. Whether portions of Defendants' counterclaim are time-barred

Allstate also argues that, medical evidence aside, some of Defendants' claims for payment are barred by a one-year limit that applies to certain no-fault benefits. *See* MCL § 500.3145. Allstate points out that the counterclaim in this suit was filed on November 9, 2020. Thus, it maintains, Defendants cannot recover for any service provided prior to November 9, 2019.

Before being sued by Allstate here, Swift and Performance had filed a number of suits in Michigan's state courts against Allstate for nonpayment. Some of those suits involved the same patients at issue in Defendants' counterclaim. To avoid litigating substantially related claims in multiple courts and cases, Defendants stipulated that they would dismiss all pending cases in other courts and pursue them as part of their counterclaim here. *See* Stip., ECF No. 49, PageID.1220. Allstate agreed that with respect to any portions of Defendants' counterclaim "for which separate litigation ha[d] already been filed, the

31

date such litigation was filed" would govern any defenses pertaining to the one-year-back rule. *Id.* at PageID.1221. Neither side has identified which patients' claims, and thus what portion of Defendants' counterclaim, were subject to prior litigation.

Defendants also point out that the no-fault statute was amended in June 2019, and a tolling provision was added. Under that provision, the one-year limitations period for a specific claim is tolled until the date that an insurer "formally denies the claim." MCL § 500.3145. Allstate does not reply to this argument and does not explain when it "formally denied" any of the claims at issue. However, the 2019 amendments to the no-fault statute were not retroactive. *Spine Specialists of Michigan, PC v. MemberSelect Ins. Co.*, ___ N.W.2d ___, 2022 WL 17073490, at *3–4 (Mich. Ct. App. Nov. 17, 2022). So that tolling provision applies only to claims for services performed on or after June 11, 2019.

On the available record, the Court cannot determine which claims were subject to prior litigation. And Allstate has not explained when, if at all, it formally denied any claims that postdate the June 2019 amendments to the no-fault statute. Accordingly, the Court cannot decide with specificity which claims are subject to the one-year-back rule.

However, the Court can make the following determination. Claims for services rendered before November 9, 2019 are barred unless one of

the following applies: (1) the claim was subject to prior litigation and thus falls under the parties' stipulation; (2) the claim was filed after the no-fault statute was amended on June 11, 2019 and Allstate did not formally deny the claim until after November 9, 2019.

### 3. Remaining claims (declaratory judgment, counterclaim, unjust enrichment)

The balance of Allstate's motion seeks dismissal of Defendants' counterclaim in its entirety as well as summary judgment in Allstate's favor on its own claim for unjust enrichment and its request for a declaratory judgment that it owes nothing to the Defendants.

In support of all three, Allstate argues that Defendants' failure to properly identify an expert dooms Defendants' claims and entitles Allstate to summary judgment on its own. Allstate is correct that the testimony of a medical expert is critical to all three claims. Defendants' claims and Allstate's declaratory relief claim are mirror images. Both depend on whether Defendants' bills were compensable under the no-fault act.

And, as Allstate points out, expert testimony is usually required to make out a claim of entitlement to no-fault benefits. Bills are only compensable under that law if they are for services to treat an injury arising out of a vehicle accident and are "reasonably necessary … for an injured person's care, recovery, or rehabilitation." MCL §§ 500.3105, 500.3107(1)(a). Furthermore, a treating provider's bills must be for a

"reasonable amount" and must not exceed the amount the provider "customarily charges for like treatment" in cases not involving insurance. MCL § 500.3157(1).

Determining whether these requirements have been met typically requires expert medical testimony. *See Lund v. Travelers Indem. Co. of Am.*, No. 330212, 2016 WL 7601903, at *4 (Mich. Ct. App. Dec. 29, 2016) (explaining that expert testimony "generally" required to "establish a causal connection between medical treatment and injuries from an accident"); *Galuten on behalf of Est. of Galuten v. Williamson Cnty. Hosp. Dist.*, No. 21-5007, 2021 WL 3043275, at *6 (6th Cir. July 20, 2021) (providing that Plaintiff was required to rebut expert testimony with their own expert when "issues turned on technical questions of medical judgment beyond the knowledge of a lay jury").

The same holds for Allstate's unjust enrichment claim. An insurer who pays for procedures later determined to be noncompensable may sue the medical provider on an unjust enrichment theory. *See, e.g.*, *Allstate Ins. Co. v. Broe*, 2008 WL 3876188, at *17 (Mich. Ct. App. Aug. 21, 2008); *Citizens Ins. Co. of Am. v. Univ. Physician Grp.*, 319 Mich. App. 642, 651 (2017). Defendants concede that they received about $85,000 from Allstate for various procedures and patients.

Allstate's unjust enrichment claim turns on whether or not Defendants' retention of that money would be inequitable because the procedures at issue were medically unnecessary or not actually

34

performed. That inquiry, in turn, depends on the same expert medical testimony relevant to the other claims discussed in this section. For the reasons discussed above, resolving this motion in Allstate's favor would be tantamount to entering a default judgment for Plaintiff against Defendants because they failed to timely disclose Swift as an expert. Such a draconian penalty is not justified here. Factually supported testimony from Swift that, in his opinion, the procedures were medically necessary, reasonable, and related to automotive accidents must be weighed against the testimony of Allstate's experts by a jury. Summary judgment on these remaining claims is therefore inappropriate at this time.

## III.   CONCLUSION

In sum, Defendants' Motion for Summary Judgment is **GRANTED** as to:

- Count I (RICO, ISpine Enterprise),
- Count II (RICO Conspiracy, ISpine Enterprise),
- Count IX (RICO, BRR Medical Enterprise),
- Count X (RICO Conspiracy, BRR Medical Enterprise),
- Count XI (RICO, Gulf Coast Enterprise), and
- Count XII (RICO Conspiracy, Gulf Coast Enterprise).

Defendants' Motion for Summary Judgment is **DENIED** as to:

- Count III (RICO, Fountain View Enterprise),
- Count IV (RICO Conspiracy, Fountain View Enterprise),

- Count VII (RICO, Performance Enterprise),

- Count VIII (RICO Conspiracy, Performance Enterprise),

- Count XV (Common Law Fraud),

- Count XVI (Civil Conspiracy),

- Count XVII (Payment Under Mistake of Fact),

- Count XVIII (Unjust Enrichment), and

- Count XIX (Declaratory Judgment).

Finally, Plaintiff Allstate's Motion for Summary Judgment is hereby **DENIED** as to Counts III, IV, VII, VIII, XV, XVI, XVIII, and XIX and Defendants' counterclaim (No-Fault Act Benefits).

**IT IS SO ORDERED**, this 21st day of September, 2023.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE